# IN RE TRUSTEESHIP UNDER AGREEMENT WITH CHARLES H. MAYO.
# ESTHER MAYO HARTZELL AND OTHERS v. G. SLADE SCHUSTER AND OTHERS.

105 N. W. (2d) 900.

November 10, 1960—Nos. 37,943, 37,944.

*Best, Flanagan, Lewis, Simonet & Bellows* and *Archibald Spencer,* for appellants.

*Dorsey, Owen, Barber, Marquart & Windhorst, David R. Brink,* and *Robert L. Crosby,* for respondent trustees.

*Richard Siegel,* for respondent William J. Mayo II.

*Roderick D. Peck,* pro se, for guardian ad litem of unknown and incompetent beneficiaries.

DELL, CHIEF JUSTICE.

Appeals from orders of the district court denying the petitions of Esther Mayo Hartzell, as beneficiary, for orders authorizing the trustees of two separate trusts created by the late Dr. Charles H. Mayo on August 17, 1917, and March 28, 1919, to deviate from identical investment restrictions in the trust instruments or to construe the term "other forms of income bearing property" as used therein as authorizing investment of trust funds in corporate stock. The donor died May 26, 1939.

The petitions were opposed by the trustees. Roderick D. Peck was appointed guardian ad litem and appeared for all "unknown, unascertained, minor and incompetent beneficiaries" with respect to both trusts. Appearances were also made on behalf of the petitioner, William J. Mayo II, one of the beneficiaries, and the trustees. The present appeals are taken by the petitioner and by a number of other beneficiaries of the trusts.

With reference to investments the provisions of both trusts are in substance as follows:

"* * * The TRUSTEES shall hold said property as a trust fund and collect the interest, income and profits therefrom as the same accrue; *manage, care for and protect said fund all in accordance with their best judgment and discretion,* invest and re-invest the same in *real estate mortgages, municipal bonds or any other form of income bearing*

*property (but not real estate nor corporate stock), * * *."* (Italics supplied.)

At the time of the hearing the value of the assets of the first trust was approximately $1,000,000, invested mostly in municipal bonds and in 1,944 shares of common stock of the Kahler Corporation, the latter coming into the trust at the time of its creation from the donor. The value of the assets of the second trust at the time of the hearing was approximately $186,000 invested mostly in municipal bonds. The first trust by its terms will continue until 21 years after the death of the petitioner, who was 51 years of age at the time of the hearing; while the second trust by its terms will partially terminate as each surviving child of petitioner attains the age of 30 years and will fully terminate when the last of such children attains such age; but in the event of certain alternatives it will not continue longer than 21 years after the death of all of donor's children.

In support of the petition, evidence was submitted that an inflationary period, which could not have been foreseen, had commenced shortly after the donor's death in 1939; that it had reduced the real value of the trust assets by more than 50 percent; that a further inflationary period or a permanent "creeping inflation," which the donor could not have foreseen, must be expected; that on December 30, 1940, when the trustees filed their first accounting, the value of the assets of the first trust was $957,711.60; that in October 1958, at the trustees' most recent accounting, the value of such assets was $968,893.08, which in terms of 1940 dollar values meant that in 1958 the assets of the first trust were worth only $456,139.67; that the same percentage of shrinkage was experienced in the second trust; that the provisions of the trust prohibiting investments in real estate and corporate stocks had caused such shrinkage; and that the market value of common stocks had almost doubled since 1939 while the actual value of bonds, in terms of purchasing power, had been cut almost in half since that time. Appellants state that even in the short period between March 1959 and November 1959 the Consumer Price Index of the U. S. Bureau of Labor Statistics has increased from 123.7 to 125.6, representing an increase of almost 2 percent in 8 months.

Petitioner urges that the donor's ultimate and dominant intention was to preserve the value of the trust corpus and that this will be circumvented unless the court authorizes the trustees to deviate from the investment provisions of the trusts and invest part of the funds in corporate stocks; that it is common practice of trustees of large trusts which have no restrictive investment provisions (including the First National Bank of Minneapolis, one of the trustees in both trusts here) to invest substantial proportions of trust assets in corporate stocks to protect such trusts against inflation, and she asserts that if no deviation is permitted and the next 20 years parallel the last 20 years the ultimate beneficiaries of these trusts will be presented with assets having less than one-fourth of the value which they had at the time of the donor's death.

In opposition to the petition, the trustees refer to the donor's clear intention, as expressed in the trust instruments, that no part of the trust funds should be invested in real estate or corporate stocks, and urge that, since no emergency or change of circumstances which could not have been foreseen or experienced by the donor during his lifetime has been shown, no deviation from the donor's clearly expressed intention would be justified. They urge that the rule is well established that where prospective changes of conditions are substantially known to or anticipated by the settlor of a trust the courts will not grant a deviation from its provisions. They point out that the donor here had survived some 20 years after the creation of the trusts during a period in which there had been both a great inflation and a severe depression; that after creating such trusts he had observed the inflation of the post-World-War-I period, the stock market fever of the pre-1929 era, the market crash of 1929, and the subsequent depression and lowering of bond interest rates during the late 1930's; that despite these economic changes he had never altered the investment restrictions in these trusts; and that he was always aware of his right to amend the trust instruments and, in fact, had consented to minor departures from the provisions of one of the trusts in 1932 and had once amended another trust to permit acquisition of common stocks, but had never requested any change in the investment provisions of the trusts now under consideration and apparently was satisfied with them exactly as they had

been drawn and executed. Petitioner offered expert testimony favoring deviation and respondents' expert testimony was to the contrary. The lower court found in favor of respondents and these appeals followed.

■ The principles governing construction of trust instruments are well settled. One of the court's highest duties is to give effect to the donor's dominant intention as gathered from the instrument as a whole.[1] Neither the court, a beneficiary, nor the legislature is competent to violate such intention.[2] When the language of the instrument is clear, the intention of the donor must be ascertained therefrom.[3] In determining such intention the court is not at liberty to disregard plain terms employed in the trust instrument.[4]

■ With respect to trust provisions restricting investments in which a trustee may invest trust funds, the courts are especially concerned in giving full effect to the donor's intention. Thus, in In re Trusteeship Under Will of Jones, 202 Minn. 187, 189, 277 N. W. 899, 900, it was held that trustees were not authorized to invest trust assets in corporate stock because of the absence of specific directions to do so and because of the trust provision that the trustees "shall invest and reinvest all principal cash in the trust fund in first mortgages on improved real estate, in municipal or corporation bonds or in any other form of income bearing property, except real estate, *but * * * shall have first regard for the safety of principal * * *.*" (Italics supplied.) The court by implication held that the provision allowing investment in corporate bonds excluded authority for investment of trust funds in corporate stocks.

Subsequently this trust again came before us in In re Trust Under Will of Jones, 221 Minn. 524, 22 N. W. (2d) 633. It was then urged that under a subsequent statutory enactment which authorized trustees to invest trust funds in corporate stocks, and because of changed economic conditions and the prospect of higher income from corporate

---

[1]In re Trust Created by Will of Crosby, 224 Minn. 173, 28 N. W. (2d) 175.

[2]In re Trust Under Will of Jones, 221 Minn. 524, 22 N. W. (2d) 633.

[3]In re Trust Created by Will of Tuthill, 247 Minn. 122, 76 N. W. (2d) 499.

[4]In re Trusteeship Created by Fiske, 242 Minn. 452, 65 N. W. (2d) 906.

stocks, the court should authorize the trustees to invest trust funds in the latter. In denying both contentions this court stated (221 Minn. 528, 22 N. W. [2d] 635):

"There has been no showing that authority to deviate from the terms of this trust is necessary to effectuate the ultimate intention of the testator or *to preserve the corpus of the trust*. * * * authority to deviate * * * is being sought solely with a view to increasing the income of the life tenants thereunder. * * * it would be improper for the court to substitute its judgment on a matter of business for that of the testator * * *." (Italics supplied.)

■ Petitioner urges that under the evidence presented here, which dealt extensively with the question of inflation and its resultant impairment of the purchasing power of the trust corpus, a question arises which was not considered in In re Trust Under Will of Jones, *supra*, and that following the suggestion made in that case that (221 Minn. 527, 22 N. W. [2d] 634) "the court may, in a proper case, invoke its equity powers to authorize a deviation from the terms of a testamentary trust," deviation should have been authorized. The general principles governing deviation to which this court has adhered whenever the question has been presented are set forth in Restatement, Trusts (2 ed.) § 167, comment *c*:

"Where by the terms of the trust the scope of investment which would otherwise be proper is restricted, the court will permit the trustee to deviate from the restriction, if, but only if, the accomplishment of the purposes of the trust would otherwise be defeated or substantially impaired. Thus the court will permit the investment if owing to changes since the creation of the trust, such as the fall in interest rates, the danger of inflation, and other circumstances, the accomplishment of the purposes of the trust would otherwise be defeated or substantially impaired. Where by the terms of the trust the trustee is not permitted to invest in shares of stock, the court will not permit such an investment merely because it would be advantageous to the beneficiaries to make it."

In applying the foregoing rule the courts have adopted certain rules for guidance. It is only in exceptional circumstances described as

cases of emergency, urgency, or necessity that deviation from the intention of the donor, as evidenced by the trust instrument, has been authorized. In most of the cases where deviation was authorized, the fact that the donor could not have foreseen the changed circumstances played an important part. Even under such circumstances deviation will not be authorized unless it is reasonably certain that the purposes of the trust would otherwise be defeated or impaired in carrying out the donor's dominant intention.[5]

■ In our opinion the evidence here, together with economic and financial conditions which may properly be judicially noticed,[6] compels us to hold that unless deviation is ordered the dominant intention of the donor to prevent a loss of the principal of the two trusts will be frustrated. When the trusts were created and for many years prior thereto, the dollar, based upon the gold standard, remained at a substantially fixed value. On March 9, 1933, the United States went off the gold standard and has since that time remained off from it domestically. While some inflation shortly thereafter followed, it was not until after the death of the donor that inflation commenced to make itself really known and felt. Since then it has gradually increased until at the time of the trial of this case the purchasing power of the dollar, measured by the Consumer Price Index of the U. S. Bureau of Labor Statistics, had depreciated to one-half of its 1940 value. While the experts called by the respective parties disagreed as to when inflation, which they felt was then dormant, would start again and at what percentage it would proceed, there was no disagreement between them that further inflation "in the foreseeable future" could be expected. There was testimony that there would possibly be none for the next year or two and that then it would "increase so that over the period of ten years, on the average, the trend line would be between one and a

[5]Gaines v. Arkansas Nat. Bank, 170 Ark. 679, 280 S. W. 993; Stone v. Clay, 103 Ky. 314, 45 S. W. 80; Matter of Young, 178 Misc. 378, 34 N. Y. S. (2d) 468; Stanton v. Wells Fargo Bank & Union Trust Co. 150 Cal. App. (2d) 763, 310 P. (2d) 1010; Thomson v. Union Nat. Bank (Mo.) 291 S. W. (2d) 178; Rogers v. English, 103 Conn. 332, 33 A. (2d) 540.

[6]See, e. g., Village of Aurora v. Commissioner of Taxation, 217 Minn. 64, 14 N. W. (2d) 292; 7 Dunnell, Dig. (3 ed.) § 345lb(8).

half and two per cent * * *." But from the date of trial to November 1959 there was an increase of almost 2 percent in the cost of living index.

At the time these trusts were created it was common practice for businessmen, in protecting their families through the creation of trusts, to authorize investments to be made by their trustees only in high-grade bonds or first mortgages on good real estate. Many of the states then had statutes preventing trustees from investing in corporate stocks or real estate. Since that time many of the states, including Minnesota,[7] have enacted statutes permitting trustees to invest in corporate stocks and real estate. In recent years most trust companies have encouraged donors, when naming the companies as trustees, to permit investment in common stocks as well as bonds and mortgages. And these trustees maintain competent and efficient employees, well acquainted with the various aspects of corporations having listed stocks, so as to enable them to make reasonably safe and proper corporate-stock purchases.

Throughout the trial considerable reference was made to the 1929 stock-market crash as a reason why deviation should not be granted. There are many reasons, however, why the market action of that period is not a controlling factor today. At that time, many of the corporations, including some of the very best, did not maintain sufficient current assets in relation to current liabilities. And several of them then carried a large funded indebtedness drawing high interest rates with comparatively early maturities. Many companies also, during that period, declared and paid higher dividends than should have been paid. As a result they did not retain and build up a sufficient surplus for future use in the business. When the crash came, many of them, because of such practices, had great difficulty for a long period of time in extricating themselves from their unfortunate financial positions. Dividends from many of such companies were stopped or greatly reduced. A few of them failed altogether. This caused the market value of stocks for a long period of time to greatly decline. But even so, almost all of the companies having corporate stock classified as

---

[7] L. 1943, c. 635.

"good, sound investment stocks" not only survived but have been paying regular and substantial dividends. Many of them are now considered outstanding, safe, investment stocks. Now almost all of these companies maintain a high ratio between their current assets and their current liabilities. They have also built up and retain large surpluses for use in their business. Many of them now have no funded debt at all; and those that do, in most instances, have fixed maturity dates well ahead in years with a satisfactory rate of interest.

Officers and directors of companies registered and listed on the New York and American Stock Exchanges, as well as beneficial owners of more than 10 percent of any of its securities, must now, under the Securities Exchange Act of 1934, file a statement with the exchange where the stock is registered and listed, and a duplicate original thereof with the Security Exchange Commission, indicating their ownership at the close of the calendar month and such changes in their ownership as have occurred during such calendar month. Such statements must be in the hands of the commission and the exchange before the 10th day of the month following that which they cover. The information thus made available is published for the benefit of the public. Large investment companies have been organized under the Investment Company Act of 1940. They now buy, sell, and own large amounts of corporate stocks in various companies. This assists in stabilizing the market in difficult financial times.

In 1929 there was no Security Exchange Commission to regulate and control corporate stock purchases or sales. Many of the people of that era were not investing in stocks at all but were gambling in them. At that time the margin requirement was only 10 percent and brokers' loans reached an alltime high of approximately $8,500,000,000. Until recently margin requirements were, as fixed within the framework of the Securities Exchange Act, 90 percent. As a result there has been very little speculation and brokers' loans have been relatively small. In 1929 large speculators pooled their resources with a premeditated plan to buy and force certain stocks upward. This upward surge prompted uninformed people to purchase those stocks. When the stocks had reached a predetermined value, the pool operators sold out, the stocks declined, and the people took the losses. During that period

promotors were dealing in public utilities stocks, merging companies together without proper relation one to the other geographically or otherwise. When the crash came those stocks suffered greatly. Some of the companies never recovered at all. And it took many of those that did recover several years to reestablish themselves again. Several of them were required to divest themselves of their complex and wide holdings under the Public Utility Holding Company Act of 1935. These practices are no longer permissible under that act and the rules and regulations of the Security Exchange Commission. Since 1932, because of heavy Federal expenditures, the national debt has grown from a high of approximately $25,400,000,000 at the end of World War I to approximately $258,600,000,000 at the end of World War II and to approximately $290,000,000,000 at the present time. Inflation has been steadily increasing. None of this was foreseeable by an ordinarily prudent investor at the time these trusts were created, nor at the time of the donor's death in 1939, since these inflationary practices did not become noticeably fixed and established until after his death.

It appears without substantial dispute that if deviation is not permitted the accomplishment of the purposes of the trusts will be substantially impaired because of changed conditions due to inflation since the trusts were created; that unless deviation is allowed the assets of the trusts, within the next 20 years, will, in all likelihood, be worth less than one-fourth of the value they had at the time of the donor's death. To avoid this we conclude that in equity the trustees should have the right and be authorized to deviate from the restrictive provisions of the trusts by permitting them, when and as they deem it advisable, to invest a reasonable amount of the trust assets in corporate stocks of good, sound investment issues. Through an investment in bonds and mortgages of the type designated by the donor, plus corporate stocks of good, sound investment issues, in our opinion, the trusts will, so far as possible, be fortified against inflation, recession, depression, or decline in prices. Corporate trustees of the kind here are regularly managing trusts consisting of corporate stocks, bonds, and mortgages on a successful basis. There appears to be no sound reason why they cannot do the same thing here.

Reversed and remanded for further proceedings in conformity with this opinion.

MR. JUSTICE THOMAS GALLAGHER took no part in the consideration or decision of this case.