**TROOST AVENUE CEMETERY COMPANY, Respondent,**

v.

**The FIRST NATIONAL BANK OF KANSAS CITY et al., Appellants.**

No. 51874.

Supreme Court of Missouri, Division No. 1.

Dec. 30, 1966.

Charles F. Lamkin, Jr., Harry D. Dingman, Kansas City, for respondent, Kuraner, Oberlander, Lamkin & Dingman, Kansas City, of counsel.

Norman H. Anderson, Atty. Gen., J. Gordon Siddens, Asst. Atty. Gen., Jefferson City, John R. Campbell, Special Asst. Atty. Gen., Kansas City, for appellant, the Attorney General.

HYDE, Judge.

Equitable class action seeking authorization for deviation from the terms of a trust instrument requiring certain designated investments. The Attorney General has appealed from the judgment authorizing deviation.

The material part of the judgment is as follows: "(1) The First National Bank of Kansas City, as trustee of the combined trust above described, is hereby permitted, empowered and authorized to deviate from the express investment policies of the trust as modified and in the investment of the trust funds to exercise the diligence and care that men of ordinary prudence, intelligence and discretion would employ, but with a view to permanency of investment considering probable. safety of capital investment, income produced and appreciation of capital investment, including but not limited to, investments in common and preferred corporate stock."

The original trust agreement, dated May 25, 1904, provided that it was the duty of the trustee to invest its funds, accumulated from deposit of five per cent of its lot sales, "in Missouri State Bonds, United States Bonds, or any bonds issued by counties, cities or school districts in Missouri, or in notes secured by first mortgages on real estate in Jackson County, Missouri."

A later supplemental trust agreement, dated May 1, 1922, requiring an additional five per cent of money received from lot sales to be set aside as an additional trust fund and provided as to this additional trust fund: "* * * it shall be the duty

of the trustee to invest said sum as soon as practicable in Missouri State bonds, United States bonds, or any notes secured by first mortgages on real estate in Jackson County, Missouri * * *."

It was stated in both agreements as "being contemplated by the parties hereto that absolute safety shall in all investments be the first and most important consideration." The original trust agreement provided the trust fund was to be accumulated for 20 years before any income was used by the cemetery. However, a later supplemental agreement of May 22, 1918, provided it was to be accumulated until it amounted to $300,000.00. It did reach that amount on May 28, 1954, and on March 9, 1955, the two trusts were consolidated as authorized by the supplemental agreements.

The cemetery company commenced with 320 acres of land and now operates two cemeteries, called Forest Hill and Calvary. Income from the trust funds is used to maintain both, for the benefit of all present owners and all future purchasers of cemetery lots. At the time of the trial in July 1965, the perpetual maintenance fund amounted to $528,283.19 (asset cost). Actual value was indicated to be about $30,000.00 more. Of this $16,000.00 was invested in real estate mortgages, $87,000.00 in municipal bonds and the rest in obligations of the United States. The trust also owned real estate valued at $6,600.00 obtained by foreclosure. About half of the land available for lots had been platted and sold during the first sixty years of its operation. There are scattered unsold lots in the platted parts of the cemeteries and considerable areas have not been platted. The cemetery also had a separate trust fund of about $28,000.00 limited to the maintenance of certain lots designated by the donors of this fund. The cemetery company has qualified under the 1961 Missouri Endowed Care Fund Law, Secs. 214.270 to 214.410, RSMo, V.A.M.S., which authorizes (Sec. 214.330) the same investment policy herein

sought, but that law does not affect the provisions of this trust.

The original trust agreement provided its purpose to be: "[G]uaranteeing that the said cemetery shall always have proper care and attention, and that walks, drives, lakes, fountains, trees, shrubs, flowers and fences shall always be maintained in good order." To accomplish this purpose it was provided: "[T]he net income thereof may be, and if necessary shall be used in perpetually maintaining and beautifying said cemetery in the following manner, to-wit: During each year said Cemetery Company, or its legal successors, shall properly maintain, beautify and ornament said cemetery in a general manner usual in large cemeteries." It was also provided that each year the cemetery company should furnish the trustee a certificate "that said Cemetery Company has properly maintained, beautified and ornamented said property, or has expended in such general maintenance a sum equal to the net income of said trust fund for said year." It was further provided that if the cemetery company did not fulfill this obligation "then said Trustee shall be empowered to enter upon said cemetery and expend the net income of said trust fund in the proper care and maintenance of said cemetery." No part of the principal of the trust is ever to be expended for any purpose.

The first supplemental agreement of May 22, 1918, provided the cemetery company was "to maintain, beautify and ornament said cemetery property each year until such time as the principal of said trust fund shall amount to the sum of $300,000.00, and to pay out of its own funds all of the expenses thereof." This agreement also stated "the Cemetery Company estimates said fund will be sufficiently large to enable the income therefrom to forever maintain said cemetery property." This agreement contained provisions similar to the original as to the use of the trust income, the annual certificate to the trustee and the duty of the trustee concerning proper maintenance.

The cemetery company offered in evidence an exhibit prepared by its accountant which showed the following figures concerning expenses and trust income for the six full years preceding the trial herein.

| | 1964 | 1963 | 1962 | 1961 | 1960 | 1959 |
|---|---|---|---|---|---|---|
| "Cemetery expenses: | | | | | | |
| Equipment maintenance and fuel | $10,202 | $11,252 | $ 9,645 | $ 8,050 | $ 9,595 | $13,067 |
| Utilities | 9,642 | 6,568 | 6,280 | 4,849 | 2,766 | 2,937 |
| Salaries | 60,277 | 45,033 | 46,773 | 44,749 | 40,715 | 35,749 |
| Supplies | 2,321 | 1,997 | 1,839 | 1,320 | 1,201 | 605 |
| Insurance | 5,009 | 3,476 | 4,451 | 3,662 | 3,721 | 3,607 |
| Grounds care | 6,298 | 11,319 | 5,627 | 5,509 | 4,908 | 4,200 |
| Miscellaneous | 1,115 | 258 | 328 | 672 | 814 | 413 |
| | 94,864 | 79,903 | 74,943 | 68,811 | 63,720 | 60,578 |
| Distributed trust income | 14,354 | 17,113 | 15,097 | 15,756 | 15,273 | 11,267 |
| Excess maintenance expense over trust income distributed | $80,510 | $62,790 | $59,846 | $53,055 | $48,447 | $49,311 |
| Percent of income received to total maintenance cost | 15.1 | 21.4 | 20.1 | 22.9 | 24.0 | 18.6" |

It is obvious from the designation of these items of expense that some of them are for expenses beyond anything authorized to be paid out of the trust fund income "to properly maintain, beautify and ornament said cemetery"; and this is made clear by the cross-examination of plaintiff's accountant by the Assistant Attorney General. He conceded that utilities "possibly except for water should not be in here * * * we did not try to break it down * * * be almost impossible to determine it." As to salaries, he said it did not include salaries of officers, office employees or salesmen but that it could include opening graves for which the cemetery company would be reimbursed. Insurance included general liability, workmen's compensation and perhaps fire insurance. The accountant did not know what was included in supplies and miscellaneous, and the equipment maintenance and fuel item was not fully explained. While it appears likely that the full amount of the trust fund income was required annually "to properly maintain, beautify and ornament said cemetery," the actual deficit, if any, cannot be determined from the evidence before the court in this case.

■ We agree, as the Attorney General contends, that the rule to be applied is that of the American Law Institute Restatement of Trusts 2d, Sec. 167(1): "(1) The court will direct or permit the trustee to deviate from a term of the trust if owing to circumstances not known to the settlor and not anticipated by him compliance would defeat or substantially impair the accomplishment of the purposes of the trust; and in such case, if necessary to carry out the purposes of the trust, the court may direct or permit the trustee to do acts which are not authorized or are forbidden by the terms of the trust." As to restrictions on investments, Comment c under Sec. 167 states the considerations we would apply, namely: "c. *Investments*. Where by the

terms of the trust the scope of investments which would otherwise be proper is restricted, the court will permit the trustee to deviate from the restriction, if, but only if, the accomplishment of the purposes of the trust would otherwise be defeated or substantially impaired. Thus the court will permit the investment if owing to changes since the creation of the trust, such as the fall in interest rates, the danger of inflation, and other circumstances, the accomplishment of the purposes of the trust would otherwise be defeated or substantially impaired. Where by the terms of the trust the trustee is not permitted o invest in shares of stock, the court will not permit such an investment merely because it would be advantageous to the beneficiaries to make it."

Plaintiff cites In re Trusteeship under Agreement with Mayo, 259 Minn. 91, 105 N.W.2d 900, where investments in corporate stocks were not authorized by the trust created in 1919. There the dominant intention of the donor was considered to be "to prevent a loss of the principal of the two trusts," which were to be distributed to the donor's descendants, not continuing longer than 21 years after the death of all the donor's children. Authorizing deviation the court said: "It appears without substantial dispute that if deviation is not permitted the accomplishment of the purposes of the trusts will be substantially impaired because of changed conditions due to inflation since the trusts were created; that unless deviation is allowed the assets of the trusts, within the next 20 years, will, in all likelihood, be worth less than one-fourth of the value they had at the time of the donor's death." See also St. Louis Union Trust Co. v. Ghio, 240 Mo.App. 1033, 222 S.W.2d 556, where income was held to be the matter of primary concern. However, in Stanton v. Wells Fargo Bank & Union Trust Co., 150 Cal.App.2d 763, 310 P.2d 1010, 1015, where deviation was denied, it was said: "Except in unusual or emergency situations the courts will limit the trustees to the powers conferred. But the courts will not permit the main purpose of a trust to fail by compelling slavish adherence to the administrative limitations of the trust instrument. Where the main purpose of the trust is threatened the courts will and should grant permission to deviate from restrictive administrative provisions. But the court should not permit a deviation simply because the beneficiaries request it where the main purpose of the trust is not threatened and no emergency exists or is threatened. It must be remembered that it is the theory of this rule that, by the exercise of this power, the court is not defeating the trust, but in fact is furthering it. The equity court is simply doing what the testator, presumably, would have done had he anticipated the changed conditions. In other words, the specific intent of the testator is disregarded in order to enforce his general intent." See also Scott on Trusts, Sec. 167; The Problem of Unduly-Conservative Trust Investments, 61 Michigan Law Review 1545.

We must consider, as plaintiff urges, that this is a perpetual trust; that the net return therefrom in the last six years varied from 3.10 per cent in highest year, 1963, to 2.55 per cent in the lowest, 1964; that because of changed circumstances as to real estate financing it was not now possible to invest in real estate mortgages of the kind contemplated when the trust was established; and that plaintiff's expert witness on investments stated that common stocks have to be held for a considerable number of years to achieve a higher rate of return than bonds but that eventually because of appreciation in value, caused in part by inflation, stock splits and corporate growth, the best stocks will do so as well as better preserving the real value of the principal.

However, the Attorney General argues that there are enough lots (including un-

platted areas) remaining to be sold so the cemetery company can continue to operate as it has been for as much as another fifty years, paying costs over trust fund income from lot sales and other income. (It appears there is other income but it was not shown how much or from what sources.) Of course, the principal of the trust will be annually increased by the addition of ten per cent of the amount received from lot sales; and thus the annual income should increase. Because of these factors, it is argued there is no present emergency or conditions sufficient for authorization to deviate from the trust provisions for investments.

 Our conclusion is that the evidence in this case is not sufficient to show at this time the accomplishment of the purposes of the trust would be defeated or substantially impaired unless deviation from the trust restrictions on investment is authorized. The trust agreements do not show it was originally contemplated that only the trust income would be used "to properly maintain, beautify and ornament said cemetery" although they authorized the use of all of it if it was required. Provisions of a trust instrument should not be lightly disregarded because some consider that in the future it would be advantageous to do so. Our view is that it cannot be properly held it is essential to the accomplishment of the purposes of this trust to permit deviation at this time from its investment restrictions, without having before the court all the information about the present income, expenses and future prospects of the cemetery company and the actual annual cost required "to properly maintain, beautify and ornament said cemetery." However, since it appears that such evidence may be available we will remand for further proceedings in accordance with the views herein expressed.

The judgment and decree is reversed and the cause remanded.

All concur.