**NORWEST BANK MINNESOTA NORTH, N.A., as Trustee of the Stephen Lisle Trust, Appellant,**

v.

**Reed BECKLER, Respondent.**

**No. C7–02–2109.**

Court of Appeals of Minnesota.

June 24, 2003.

James A. Wade, Roy J. Christensen, Johnson, Killen & Seiler, P.A., Duluth, MN; and Thomas H. Boyd, Matthew D. Spohn, Winthrop & Weinstine, P.A., St. Paul, MN, for appellant.

John F. Bonner, III, Robert J. Borhart, Bonner & Borhart LLP, Minneapolis, MN, for respondent.

Considered and decided by HUDSON, Presiding Judge, TOUSSAINT, Chief Judge, and MINGE, Judge.

## OPINION

HUDSON, Judge.

Appellant bank, acting as corporate trustee, sued to enforce obligations to the trust under a note executed in favor of decedent settlor allegedly owed by his for-

mer son-in-law. Respondent's former son-in-law counterclaimed seeking declaratory relief and damages. The jury found, by special verdict, that: (a) the receipt of a future gift of $125,000 under the settlor's trust formed a condition precedent to the repayment of the note; (b) the surviving spouse of the settlor, in her attempt to exercise a special power of appointment to remove all assets from the trust, lacked capacity and was unduly influenced in her attempt to disinherit the former son-in-law; and (c) the corporate trustee bank breached its fiduciary duty by advising the spouse to disinherit the former son-in-law. Because the evidence sustains the jury's verdict as to the existence of the condition precedent, undue influence, and lack of capacity, we affirm on those issues. We reverse, however, on the issue of breach of fiduciary duty because we conclude that the bank, which merely advised the spouse on the possibility of exercising the special power of appointment and referred her to independent counsel, did not materially affect her decision to exercise that power in derogation of any legal duty to the former son-in-law as a successor beneficiary.

## FACTS

Appellant Norwest Bank[1] brought this action as trustee of a trust created by Stephen Lisle in order to enforce respondent Reed Beckler's (Beckler) obligations under a promissory note allegedly due and owing to the trust. The promissory note, signed by Beckler on June 1, 1993, evidenced a loan of $150,000 made by Lisle to Beckler to purchase the land on which Beckler's mobile home sales and finance business operated. At that time Beckler was married to Lisle's daughter, Cynthia Lisle Beckler. Beckler had a close rela-

---

1. Appellant Norwest Bank is now Wells Fargo Bank Minnesota, N.A., but is referred to as Norwest in this opinion for the sake of clarity.

tionship with his father-in-law, who had previously loaned him money to use in connection with his business.

The parties negotiated a rate of 10.5% interest on the loan, but no date was specified for repayment of the principal of the note. Beckler testified that it was his understanding, from a meeting with Lisle, that the note was to be repaid from a specific gift of $125,000 that Beckler was to receive, along with Cynthia Beckler, on Lisle's death, pursuant to the terms of a trust created by Lisle. According to Beckler, when he received word of the future gift, he took the note, which had previously listed only Lisle's name as payee, and added the word "Trust" in blue ink.

Stephen Lisle had executed this revocable trust in June 1993, naming Norwest Bank as corporate trustee. He had also executed a will in February 1993. His wife, Catherine Lisle, had executed a similar trust. The Restatement of Stephen M. Lisle Revocable Trust Agreement, Article 4b.(2) provided a special power of appointment:

> [M]y trustee shall pay to or apply directly for the benefit of the group consisting of my children or their issue, such amounts or portions of the FAMILY TRUST as my wife, from time to time, may direct in writing. Her written request for such purpose shall be filed with my trustee, and may be effective immediately or upon the occurrence of a date or event in the future, such as upon her death. The special power of appointment conferred upon my wife under this subparagraph (2) shall not be exercisable in favor of, or for the benefit of herself, her estate, her creditors, or the creditors of her estate, or for the purpose of discharging her legal obligations. Any amount distributed to a beneficiary pursuant to the provisions of this subparagraph (2) shall not be charged against the share of the trust ultimately distributed to such beneficiary, as hereinafter provided, unless my wife shall so direct in the instrument exercising the special power of appointment.

Around the time he executed the trust, Lisle discussed the promissory note with Keir Johnson, the Norwest trust officer assigned to the Lisle accounts. At Lisle's direction, Johnson was not currently responsible for collecting interest on the note, but if Lisle became incompetent or deceased, Johnson was to treat it as a trust asset and collect the interest and principal when due.

In May 1994, Lisle had a stroke and died shortly thereafter. Upon his death, the trust changed from revocable to irrevocable. During June 1995, Johnson attempted to negotiate with Beckler regarding the terms of the note, seeking security for the note in the form of a mortgage on Beckler's property. Beckler refused to grant a mortgage and stopped paying interest on the note in March 1996, about the time that he and his wife instituted dissolution proceedings.

As the dissolution proceedings became more heated, Catherine Lisle contacted Johnson and expressed her wish to disinherit Beckler. In addition, Cynthia Beckler informed Johnson that Catherine Lisle wanted to eliminate the gifts to Beckler from the trust instruments. Johnson initially told Catherine Lisle that she could change the provisions of *her* trust, but that because Lisle had died, his trust could not be changed. At the time of the Beckler dissolution trial, however, Johnson became aware of a method by which this objective could be accomplished: by exercising her special power of appointment under the Stephen Lisle trust, Catherine Lisle could direct the trustee to pay out the trust

funds among the descendants in any way that she chose, so that, as a result, no money would remain in the trust for payment of the gift to Beckler.

Johnson explained this provision ·to Catherine Lisle. At her request, he then called her attorney, Paul Steil, and conveyed Lisle's wishes to him. Steil drafted the necessary document for exercising the special power of appointment. He then went to Lisle's home along with Johnson for her to sign it. Steil reviewed the document, explaining its effect to her. Catherine Lisle signed the special power of appointment pursuant to Article 4b.(2) in the trust agreement on May 21, 1997. Steil testified that she was "very pleased that she was able to make this change," which negated the gift of $125,000 to Cynthia and Reed Beckler. Steil also suggested that she might want to revoke a power of attorney that she had given Beckler. She agreed that she wanted to do that, and he prepared that document for her signature. According to Steil, Catherine Lisle appeared, in his professional opinion, to possess testamentary capacity.

Catherine Lisle also made changes in her own revocable trust in favor of her daughter, Cynthia Lisle Beckler, during this time period. For instance, she changed the gift of $125,000 in her trust from Reed and Cynthia Beckler to Cynthia alone, and provided that Cynthia would receive Catherine's house on her death. She also increased the gift to Cynthia Beckler from her own trust from $125,000 to $250,000.

A caregiver working for Catherine Lisle at this time testified that Cynthia Beckler had a negative relationship with her mother. For instance, Cynthia Beckler frequently asked Catherine Lisle to sign things, she would call her mother ten to fifteen times a day, she took her mother on two- to three-hour walks that her mother did not enjoy, and placed antianxiety medication in her food. The caregiver testified that Catherine Lisle would eventually sign the documents requested by Cynthia Beckler. The caregiver also testified that after Cynthia Beckler's calls, Catherine Lisle was "usually shaky" and often responded "all right," "I will." One of the caregivers left the employ of Catherine Lisle because she believed that Cynthia Beckler was turning Catherine Lisle against the caregiver. Another caregiver also spoke of similar incidents and testified that Cynthia Beckler, on one occasion, forced Catherine Lisle to eat. A third caregiver, however, refuted that testimony and spoke of a loving mother-daughter relationship.

Catherine Lisle signed two related documents in the summer of 1997, witnessed by her caregiver. In one document, Lisle stated that if Beckler paid the $150,000 note, plus interest, the repayment would be put into Cynthia Beckler's portion of the family trust. The other document stated that the $150,000 note was not an obligation of Cynthia Beckler. On the advice of her attorney, Lisle rescinded these directives in December 1997.

Norwest filed this lawsuit in November 1997 to collect on the promissory note signed by Beckler. Beckler alleged as affirmative defenses (a) that his receipt of the $125,000 gift was a condition precedent to his obligation to pay on the note, and (b) that Catherine Lisle lacked testamentary capacity to exercise the special power of appointment to pay out all of the trust assets and her decision to do so was the product of undue influence by Cynthia Beckler. Beckler also filed a counterclaim for breach of fiduciary duty against Norwest, claiming that it owed a fiduciary duty to him as a beneficiary under the trust and breached that duty by advising Catherine Lisle how to remove the gift to him under the trust.

Also in November 1997, Catherine Lisle's two sons, Michael and Stephen Lisle, supported a petition for general conservatorship over their mother. Attorney Steil represented Catherine Lisle in the conservatorship proceedings, which resulted in an agreement appointing Catherine Lisle's accountant and administrative assistant as conservator of her person and Johnson as conservator of her financial affairs.

In March 1999, the trial court denied Norwest's motion for summary judgment on the claim involving the promissory note. The court ruled that, although Beckler could not present parol evidence to establish a modification of the terms of payment for the note, he could present evidence to determine whether Beckler's receipt of the gift under the trust was a condition precedent to repayment of the loan.

After numerous discussions with Steil over a six-month time span, Catherine Lisle signed another special power of appointment in July 1999. The exercise of this special power of appointment substantially changed the way in which she disposed of not only her own assets, but also the assets in Stephen Lisle's trust, as distributed between the children and grandchildren. Steil testified that, in his opinion, she had testamentary capacity at that time as well. Moreover, a psychologist evaluated Catherine Lisle before she signed the documents and concluded that she was competent.

In August, 1999, Johnson wrote to Cynthia Beckler in response to her concern that her cash flow (then $5,000 per month, paid from her mother's revocable trust), would be disrupted by claims that might be raised by her brothers after Catherine Lisle's death. Johnson indicated that Stephen and Michael Lisle might claim that Cynthia Beckler unduly influenced their mother to make changes to her estate plan that were favorable toward her, Cynthia Beckler, not the sons.

At Catherine Lisle's deposition during November 1999, her doctor indicated in a letter that she had chronic obstructive lung disease and it took her a long time to answer questions. During the deposition, she appeared confused and did not remember drafting the initial revocable trusts. Catherine Lisle died shortly thereafter.

The court held a jury trial in May 2002, on the issues of whether Beckler's receipt of the gift pursuant to the trust agreement was a condition precedent to repayment of the note, whether Catherine Lisle lacked testamentary capacity and was unduly influenced in her exercise of the special power of appointment, and whether Norwest breached a fiduciary duty to Beckler by informing Catherine Lisle of her ability to exercise the special power of appointment to remove the gifts to Beckler from the trust. The jury returned a special verdict, finding that, although Beckler owed $150,000 on the note plus accrued interest of $97,992.21, there was a condition precedent to repayment of the loan. The jury found that Norwest, as trustee, owed a fiduciary duty to Beckler, and that the bank breached that duty, causing damages of $83,054.71. Finally, the jury found that the trust document allowed Catherine Lisle to use the special power of appointment under the trust to disinherit Beckler, but that she lacked testamentary capacity and was unduly influenced to disinherit Beckler when she did so. The trial court denied Norwest's motion for judgment notwithstanding the verdict, or, in the alternative, a new trial on the issues of breach of fiduciary duty, condition precedent, lack of testamentary capacity, and undue influence. This appeal followed.

## ISSUES

I. Does the evidence support the jury's finding that respondent's future gift

constituted a condition precedent with respect to liability on a promissory note?

II. Does the evidence support the jury's findings that decedent's spouse lacked testamentary capacity and was unduly influenced in exercising special powers of appointment pursuant to the trust?

III. Did Norwest breach a fiduciary duty to Beckler, a successor beneficiary, by informing Catherine Lisle, the current beneficiary, of her ability to exercise the special power of appointment to prevent Beckler from receiving funds under the trust?

## ANALYSIS

We review de novo the denial of a motion for judgment notwithstanding the verdict. *Pouliot v. Fitzsimmons*, 582 N.W.2d 221, 224 (Minn.1998). In this review, we view "the evidence in the light most favorable to the nonmoving party * * *." *Id.* (citation omitted). We determine whether the jury's verdict is "manifestly against the evidence" or whether, despite the jury's factual findings, the moving party should be awarded judgment as a matter of law. *Id.* (citation omitted).

The decision to grant a new trial lies within the trial court's sound discretion, and we will not disturb its decision absent an abuse of that discretion. *Halla Nursery, Inc. v. Baumann–Furrie & Co.*, 454 N.W.2d 905, 910 (Minn.1990). We will reverse a jury verdict only if it is "manifestly and palpably contrary to the evidence viewed as a whole and in the light most favorable to the verdict." *Roemer v. Martin*, 440 N.W.2d 122, 124 (Minn.1989) (quotation omitted).

**I**

▆▆ Norwest first argues that the record lacks objective evidence supporting Beckler's claim that his receipt of the future gift of $125,000 pursuant to the trust was a condition precedent to the repayment of the promissory note. An intent to be contractually bound is determined by the objective manifestations of the parties' words, conduct, and documents, and not by their subjective intent. *Holman Erection Co. v. Orville E. Madsen & Sons*, 330 N.W.2d 693, 695 (Minn.1983). But

[w]ords are not the only medium of expression. The conduct of the parties is also to be looked to since it often conveys as clearly as words a promise or an assent to a proposed promise.

*Cut Price Super Markets v. Kingpin Foods, Inc.*, 256 Minn. 339, 354, 98 N.W.2d 257, 268 (1959). In this case, the evidence showed that Beckler and Lisle were close as father and son-in-law; Lisle had previously helped Beckler find work and extended smaller business loans to him. In view of Beckler and Lisle's close relationship, the jury could reasonably find that Beckler's testimony that Lisle wished to help him purchase the land on which his mobile home business stood was credible, and that it was equally credible that Lisle, in making a larger loan, would provide that Beckler need not repay him until Beckler received the anticipated gift from Lisle's trust.

▆▆ Norwest also argues that the trial court erred in admitting evidence of Beckler's understanding of a condition precedent to repayment of the promissory note because any such agreement between Beckler and Lisle constituted a contract to make a will, which is invalid as a matter of law absent a writing signed by the decedent. *See* Minn.Stat. § 524.2–514 (2002) (requiring, in order to establish a contract to make a will, "a writing signed by the

decedent evidencing the contract"). But in this case, Lisle did not contract to make a future bequest; he had a valid, previously-existing will. Within three days after the note in question was signed, he also executed a trust agreement which provided, at his death, an unequivocal $125,000 gift to Beckler and his then-wife, Cynthia Beckler, subject only to the trust's ability to fund the gift. The understanding between Lisle and Beckler operated only as a collateral agreement to forbear collection of the promissory note until the existing gift would devolve upon Beckler with due operation of law after Lisle's death. As such, this collateral agreement does not constitute a contract to make a will within the meaning of Minn.Stat. § 524.2–514. Thus, the jury's verdict that the receipt of the gift was a condition precedent to the repayment of the note was not manifestly against the weight of the evidence.

**II**

■ Because the exercise of the special power of appointment under the trust is akin to executing a will, the standard used in evaluating the capacity of Catherine Lisle to execute these powers of appointment is that used in determining testamentary capacity for the execution of a will. *See, e.g., Arneson v. Arneson,* 372 N.W.2d 20, 21 (Minn.App.1985) (considering issues of lack of testamentary capacity and undue influence in context of trust instrument), *review denied* (Minn. Oct. 11, 1985). A testator will be found to have testamentary capacity if the testator understands

> the nature, situation, and extent of his property and the claims of others on his bounty and * * * [is] able to hold these things in his mind long enough to form a rational judgment concerning them.

*In re Estate of Congdon,* 309 N.W.2d 261, 266 (Minn.1981) (quotation omitted). Fac-

tors to be considered in determining whether testamentary capacity exists include: (1) the reasonableness of the proposed disposition; (2) the testator's conduct before and after the execution of the document; (3) any prior adjudication regarding the testator's mental capacity; and (4) any expert testimony concerning the testator's physical and mental condition. *In re Estate of Anderson,* 384 N.W.2d 518, 520 (Minn.App.1986). Because testamentary capacity is a less stringent standard than the capacity to contract, an individual subject to conservatorship may still be found to have testamentary capacity. *Congdon,* 309 N.W.2d at 267.

■ In reviewing a trial court's denial of JNOV, we will not reverse unless the evidence reaches the "practically conclusive" threshold, even if a different jury might have reached another conclusion. *Pouliot,* 582 N.W.2d at 225. The jury determines the weight and credibility to be given to testimony. *SCSC Corp. v. Allied Mut. Ins. Co.,* 536 N.W.2d 305, 311 (Minn. 1995). In this case, when viewing the evidence in favor of the verdict, we conclude that the jury could reasonably have found that Catherine Lisle lacked testamentary capacity to execute the special power of appointment in 1997 when she attempted to remove funds from the trust so that Beckler's gift could not be funded. We acknowledge that the testimony of her attorney, Paul Steil, would support a conclusion that Catherine Lisle had the capacity to understand to whom she wanted to leave her money. But the establishment of a general conservatorship approximately seven months later, while not dispositive, reasonably supported an inference that Catherine Lisle needed significant assistance to make financial and personal decisions. The jury's verdict is similarly supported by evidence that Catherine Lisle was confused about drafting the initial re-

vocable trusts and her later exercise of the special power of appointment when she was deposed. We cannot put ourselves in the place of the jury and must assume that they found the evidence of incapacity more compelling, persuasive, and credible.

The jury also found that Catherine Lisle was unduly influenced in her exercise of the special power of appointment to disinherit Reed Beckler. A showing of undue influence requires that the influence exerted was "so dominant and controlling of the testator's mind that" the testator "ceased to act of [her] own free volition and became a mere puppet of the wielder of that influence." *In re Estate of Pundt*, 280 Minn. 102, 104–05, 157 N.W.2d 839, 841 (1968). Undue influence, by its nature, is often shown only by circumstantial evidence. *In re Estate of Peterson*, 283 Minn. 446, 449, 168 N.W.2d 502, 504 (1969). Factors indicating undue influence in the context of a will include: (a) an opportunity to exercise such influence; (b) a confidential relationship between the testator and the person purportedly exercising undue influence; (c) active participation in the preparation of the will by person purportedly exercising undue influence; (d) disinheritance of those who would likely have been named in the will; (e) singularity of the will's provisions; and (f) the use of influence or persuasion to induce the testator to make the will in question. *Id.* at 449, 168 N.W.2d at 504.

In this case, the clear weight of the evidence supports the jury's verdict that Catherine Lisle was unduly influenced when she exercised the special power of appointment in May 1997. The record established that Cynthia Beckler, who was close to her mother, had the opportunity to exercise such influence. In fact, in 1996–97, Catherine Lisle made substantial changes to her own estate in favor of her daughter. In addition, one of the caregiv-

ers testified that Cynthia Beckler called her mother ten to fifteen times per day, and that Catherine Lisle was "usually shaky" after those calls and often responded "all right," "I will." Another caregiver indicated that Cynthia Beckler would frequently subject her mother to screaming, name calling and physical intimidation. On one occasion, Cynthia Beckler tried to force Catherine Lisle to eat without first allowing her to orient herself by waking up and situating her false teeth in her mouth properly. According to the caregiver, Cynthia Beckler forced food into her mother's mouth despite protestation. On this record, the jury could reasonably have found that Catherine Lisle was subject to undue influence by Cynthia Beckler in exercising the special power of appointment to disinherit Reed Beckler. Accordingly, we conclude that the trial court did not abuse its discretion in failing to order a new trial, or err in failing to grant JNOV on this issue.

### III

Lastly, we consider the jury's finding that Norwest, as trustee, breached a fiduciary duty to Beckler by advising Catherine Lisle that she could exercise the special power of appointment under her husband's trust to prevent Beckler from receiving funds from that trust. A trustee has the duty to "exercise reasonable care, skill, and caution" in investing and managing trust assets "as a prudent investor would, by considering the purposes, terms, distribution requirements, and other circumstances of the trust." Minn.Stat. § 501B.151, subd. 2(a) (2002). A trustee may not exercise its discretion in a manner that defeats the settlor's intent or the purposes of the trust. *United States v. O'Shaughnessy*, 517 N.W.2d 574, 577 (Minn.1994). But "[so] long as the trustees act in good faith, from proper motives,

and within the bounds of reasonable judgment, the court will not interfere with their decisions." *Id.* (citation omitted).

■■■ We must therefore determine whether Norwest acted in good faith and used reasonable judgment in advising Catherine Lisle that she could exercise the special power of appointment. In our review, we recognize that the ultimate purpose of interpreting a trust is to effectuate the intent of the grantor. *In re Trust of Tufford,* 275 Minn. 66, 71, 145 N.W.2d 59, 64 (1966); *see also In re Trusteeship under Agreement with Mayo,* 259 Minn. 91, 95, 105 N.W.2d 900, 903 (1960) (stating that "[o]ne of the court's highest duties is to give effect to the donor's dominant intention as gathered from the instrument as a whole" (citation and footnote omitted).

■■■ The Restatement (Third) of Trusts § 232, at 181 (1992) states:

If a trust is created for beneficiaries in succession, the trustee is under a duty to the successive beneficiaries to act with due regard to their respective interests.

\* \* \* \*

The precise meaning of the trustee's duty of impartiality and the balancing of competing interests and objectives inevitably are matters of judgment and interpretation. Thus, the duty and balancing are affected by the purposes, terms, distribution requirements, and other circumstances of the trust, not only at the outset but as they may change from time to time.

*Id.,* cmt. c, at 182. A trustee holding for successive beneficiaries owes each a duty to administer the trust impartially for all beneficiaries. George G. Bogert, et al., *The Law of Trusts and Trustees,* § 541, at 163 (2d ed. rev.1993). But it is also the trustee's duty to "disclose to the beneficiary fully, frankly, and without reservation

all facts pertaining to the trust." *In Re Enger's Will,* 225 Minn. 229, 239, 30 N.W.2d 694, 701 (1948) (citation omitted). In addition,

[i]f under the terms of the trust a person has power to control the action of the trustees in certain respects, the trustee is under a duty to act in accordance with the exercise of such power, unless the attempted exercise of the power violates the terms of the trust or is a violation of a fiduciary duty to which such person is subject in the exercise of the power.

Restatement (Third) of Trusts § 185, at 151 (1992). If control of a trust is conferred on a beneficiary, that power is likely, though not necessarily, to be conferred on that person for his or her own benefit, rather than for the benefit of the other beneficiaries. IIA Austin W. Scott & William F. Fratcher, *The Law of Trusts,* § 185, at 564 (4th ed., 1987).

■■■ The construction of an unambiguous written document is reviewed de novo by this court. *In re Trust by Hill,* 499 N.W.2d 475, 482 (Minn.App.1993), *review denied* (Minn. July 15, 1993). When construing a trust instrument, the court must give effect to the trustor's intent as determined from the document as a whole. *Mayo,* 259 Minn. at 95, 105 N.W.2d at 903. If the trust instrument is ambiguous, however, extrinsic evidence may be admitted to resolve its ambiguity. *Towle v. First Trust,* 194 Minn. 520, 522, 261 N.W. 5, 7 (1935).

■■■ The special power of appointment in the Stephen Lisle Trust stated that the trustee

shall pay to or apply directly for the benefit of the group consisting of my children or their issue, such amounts or portions of the FAMILY TRUST as my wife, from time to time may direct in writing.

We find it unlikely that Stephen Lisle, in giving Catherine Lisle the special power of appointment in favor of their children and grandchildren, intended to give her that power for the benefit of Reed Beckler, who was not a child or grandchild of the Lisle family. Therefore, we recognize the primacy of Norwest's fiduciary duty to (a) inform Catherine Lisle of her rights under the special power of appointment and (b) pay out trust funds, in accordance with the terms of the trust, only if she chose to exercise it. We thus conclude that, under these circumstances, Norwest's duty to allow Catherine Lisle to carry out the terms of the trust and exercise her special power of appointment trumps any fiduciary duty owed to Beckler as a successive beneficiary. *See, e.g., O'Shaughnessy,* 517 N.W.2d at 577 (noting settlors' intent reflected in trust provision allowing trustees to "pay out all of the income and principal to [beneficiary's] father, thereby terminating the Trust and excluding [beneficiary] from the trust assets").

In so concluding, we note that it was Catherine Lisle who contacted Johnson, the Norwest trust officer, to inquire whether the terms of the trust allowed her to prevent Beckler from receiving funds from the Stephen Lisle trust. Furthermore, Johnson did not act as Catherine Lisle's attorney in this transaction; he simply informed her, as a beneficiary, of the powers she was able to exercise under her husband's trust. Johnson was thus exercising his discretion as trustee to carry out the intent of Stephen Lisle, as expressed in the trust agreement, to provide Lisle's wife with the power, after Lisle's death, to distribute trust assets to the trust beneficiaries. To carry out this intent, Johnson referred Lisle to attorney Steil, who consulted with her, performed the drafting, explained the documents, and made an independent determination of her testamentary capacity. Thus Johnson avoided a possible conflict of interest with his fiduciary duty as trustee. Notably, at the time the power of appointment was exercised, Norwest, as trustee, was responsible for collecting interest payments on the promissory note owed by Beckler, who was refusing to pay the interest as it became due and was thus acting adverse to the interests of the trust. In sum, Norwest was attempting to carry out the bank's fiduciary duty of impartiality, frank disclosure, and due regard for the family's interest, by providing information to Catherine Lisle regarding the special power of appointment reserved to her under the Stephen Lisle trust.

## DECISION

On the record presented, the evidence as a whole supports the jury's verdict that Reed Beckler's receipt of his portion of the $125,000 gift from Stephen Lisle's trust was a condition precedent to the repayment of the promissory note executed by Beckler. In addition, the jury could have reasonably found that Catherine Lisle lacked testamentary capacity and was unduly influenced by Cynthia Lisle Beckler to exercise the special power of appointment contained in Stephen Lisle's trust. We conclude, however, as a matter of law, that Norwest did not breach its fiduciary duty by informing Catherine Lisle of her right to exercise a special power of appointment under Stephen Lisle's trust, when the special power was designated for the benefit of Lisle's children and grandchildren and when Norwest referred Catherine Lisle directly to independent counsel, who drafted the necessary documents and represented her interests in the transaction. We therefore reverse the trial court's denial of JNOV on that issue.

**Affirmed in part, reversed in part.**