Carol Daniels TOOMBS, Respondent,

v.

David M. DANIELS, John H. Daniels, and Amelia Luzaich, Thomas Truman Daniels, et al., Appellants.

In the Matter of the Trusteeship of the Trust Created under the Agreement and Declaration of Trust dated March 1, 1920, by and between John W. Daniels, Thomas L. Daniels, Amelia L. Daniels and Frances H. Daniels, as Subscribers and John D. Daniels, Thomas Daniels and Amelia L. Daniels as Trustees.

No. C9–83–89.

Supreme Court of Minnesota.

Jan. 25, 1985.

Lawrence C. Brown, Bonnie M. Fleming, Minneapolis, for David A. Daniels, John H. Daniels and Amelia Luziach.

John L. Hannaford, Alan I. Silver, St. Paul, for Cluett David K. Daniels, Thomas Truman Daniels, Thomas Tilden Daniels, Katherine A. Daniels, William C. Daniels, Forrest L. Daniels, III, and Carolyn Daniels.

John H. Daniels, Jr., Minneapolis, for Martha Daniels, Martha D. Jones, Martha W. Shull, Willard C. Shull, IV, John H. Daniels, Jr., Jane Daniels Moffett, Christopher W. Daniels and Cedar Daniels.

Lawrence E. Larson, Greenwich, Conn., for Jean D. Cluett and David K. Daniels.

Raymond A. Reister, Thomas Tinkham, William J. Berens, Minneapolis, for respondent.

AMDAHL, Chief Justice.

The trustees and other beneficiaries of the John W. Daniels Trust Estate jointly appeal from a declaratory judgment entered by the Hennepin County District Court declaring that Carol Daniels Toombs is and has been, since her adoption in March 1936, a beneficiary of a trust created in 1920 by the agreement of four settlors: her grandparents, John H. and Amelia L., and her parents, Thomas L. and Frances H. Daniels. Carol was awarded the sum she would have received as a beneficiary less certain gifts made to her by her adoptive parents, including a special trust paid to her in 1970, for a total of $1,558,-876.61. Interest was denied. The trustees were also directed to pay Carol, and all persons claiming through her, ¼ of the income of the trust or such other portion due to the beneficiaries, as it becomes due but not less than annually, and the same fractional share of the principal upon any distribution. Carol assigns as error the trial court's refusal to award approximately $1,519,354.49 in prejudgment interest.

The trustees had petitioned the lower court for a construction of the trust instrument to the effect that adopted children are precluded from beneficiary status and for a determination that the intent of the settlors was specifically to exclude adopted children.

The trustees denied that Carol had any interest in the trust and alleged that her claim was barred by the applicable statute of limitations and by principles of equity, estoppel, waiver and/or laches.

We agree that the trust instrument does not explicitly exclude adopted children. We also agree that the trustees have not proven by extrinsic evidence that the intent of the settlors was to exclude adopted children. We therefore affirm the decision of the trial court but remand for a redetermination of Carol's interest in the income of the trust since October 4, 1973, and the awarding of prejudgment interest since that time.

John W. Daniels was a founder of the Archer-Daniels Linseed Company which became the Archer-Daniels-Midland Company. John married Amelia in 1879 and they had one son, Thomas. On March 1, 1920, the John W. Daniels Trust Estate was created by John W., (who was then 63 years of age,) Amelia (61), Thomas (27), and Frances (23), each of whom was a settlor, a trustee, and a named beneficiary. Tom and Frances' son, Forrest (13 months old), was also a named beneficiary. The trust provided that at the death of a beneficiary, his or her executors, administrators, or assigns would succeed to his or her rights. John H. Daniels was born to Tom and Frances in 1921. In 1923 the trust agreement was amended to add John H. as a named benefi-

ciary and to add Article XI, the provision at issue in this litigation. Article XI provides, in pertinent part:

> If any child or children are hereafter born to the said Thomas L. Daniels and Frances H. Daniels, his wife, such child or children shall share equally in the trust estate and the income thereof with the six beneficiaries hereinabove named, and the shares of the six beneficiaries hereinabove named shall be reduced accordingly, and the number of units increased accordingly.
>
> Upon the death of John W. Daniels, his entire interest in the trust estate shall be added to the share of Amelia L. Daniels if she be then living, and, if she be not then living, shall be added in equal parts to the shares of those then surviving of the following named beneficiaries, to wit: Thomas L. Daniels, Frances H. Daniels, Forrest L. Daniels, John H. Daniels, and any other children hereafter born to the said Thomas L. Daniels and Frances H. Daniels; * * *.

(Emphasis added). The provision repeats the above language with regard to the death of each of the other settlors and then concludes as follows:

> [B]ut if any of the children of Thomas L. and Frances H. Daniels shall die before the termination of the trust, leaving a spouse or issue or both, the survivors from time to time of such spouse and issue shall take in equal shares the share of income and principal to which such deceased child would have been entitled if living, including any amounts which would have been added thereto from the shares of other deceased beneficiaries if such child has survived. The term 'issue' shall not include adopted children.

(Emphasis added).

The 1923 Amendment revoked all power to amend or alter the trust instrument. Tom and Frances had a third son, David, in 1927, who immediately became a beneficiary pursuant to the amended Article XI.

The principal settlor, John W., died in 1931. In 1936, a baby girl, Carol, was adopted by Tom and Frances. The adoption order provided that Carol should

> to all legal intents and purposes, be the child of the petitioners [Tom and Frances] and for the purpose of inheritance and all other legal incidents and consequences, shall be the same as if she had been born to them in lawful wedlock.

John's wife Amelia died in 1938. Tom's wife Frances died in March of 1969 and Tom remarried. Tom died in 1977. The trust is to terminate in 1998, 21 years after the death of the last surviving settlor, Tom.

The entire family and the outside trustees were under the impression, and frequently told Carol over the years, that the provisions of the trust were unchangeable and precluded Carol from being a beneficiary. Hence, the trustees had never given Carol any interest in or accounting of the trust until this action. Tom set up a separate trust for Carol because she was not a beneficiary of the John W. Daniels trust. He also made substantial gifts to her for the same reason. But these were not given in exchange for any agreement not to contest the trust. Moreover, there was evidence that he also made substantial gifts to his two sons and the total Tom gave to Carol did not approach the amount she would have been entitled to receive had she been included in the John W. Daniels Trust.

In 1969 Carol became aware that a court might construe the phrase "child of" in a trust instrument to include adopted children. She asked Amelia Luzaich, a trust employee and current trustee, to show her the trust instrument. Amelia only showed Carol part of the instrument and upon finding the language "hereafter born to" instead of "child of" Carol concluded she had no colorable claim. She made no further inquiries about the trust until 1977 except for one conversation with her stepmother June Daniels in the early 1970's. At that time June said that she had consulted a California attorney who concluded that neither June nor Carol had any claim to the trust.

After Carol's visit in 1969, Amelia Luzaich consulted with Tom, John H., and various attorneys. The substance of these conversations is largely unknown because of the invocation of the attorney-client privilege, but both John H. and Amelia Luzaich admitted that from that point on they knew there was a possibility that the court would declare Carol to be a beneficiary. They also knew that they could have instituted a legal action to have the question resolved. The trustees chose not to do so. Nor did they inform Carol of this knowledge even though Amelia, throughout this time period, had the responsibility for handling all of Carol's financial affairs including making out tax returns, arranging investments, having the power of attorney and the key to her safety deposit box, and even controlling Carol's children's savings accounts.

Shortly after her father Tom died in 1977, Carol realized that she could no longer count on her father should she or her children require financial aid and consequently commenced this suit on October 4, 1979.

■ 1. Appellants contend that the critical evidence in this case has been stipulated, or is contained in undisputed testimony, or in disputed oral testimony that is rendered "extremely doubtful" by the written evidence. Hence, they urge us to apply the *de novo* standard of review enunciated by *In re Trust Known as Great Northern Iron Ore Properties*, 308 Minn. 221, 225–26, 243 N.W.2d 302, 305, *cert. denied*, 429 U.S. 1001, 97 S.Ct. 530, 50 L.Ed.2d 612 (1976), *later appealed*, 263 N.W.2d 610 (Minn.1978), *cert. denied*, 439 U.S. 835, 99

S.Ct. 116, 58 L.Ed.2d 130 (1978). Although it is true that a great deal of documentary evidence forms a part of the record in this case (350 exhibits), a five-volume trial transcript was also prepared (8 days of testimony). A significant amount of testimony concerns the subscribers' intent and disputed expert opinions about the construction of the language of the trust instrument. The trial judge's evaluation of the credibility of the testimony of these witnesses is extremely significant. Hence, we will apply the "clearly erroneous" standard of review to the factual findings below which will only be held to be clearly erroneous if we are "left with the definite and firm conviction that a mistake has been committed." *In re Estate of Balafas*, 293 Minn. 94, 96, 198 N.W.2d 260, 261 (1972). *See also* Minn.R.Civ.P. 52.01.

■ 2. *In re Trusts Created by Agreement with Harrington*, 311 Minn. 403, 250 N.W.2d 163 (1977), delineated the method of analysis to be applied when construing whether a trust instrument excludes adopted children. We declared that "the presumption in Minnesota at the time these trusts were drafted was, and still is, that adopted children will inherit from kindred of their adopted parents." [1] *Id.* at 407–408, 250 N.W.2d at 166. Accordingly, *Harrington* firmly established the proposition that: "Adopted children are conclusively presumed to have the same rights as any other children under a will or similar document, unless adopted children are *explicitly excluded* by the testator." *Id.* at 411, 250 N.W.2d at 167 (emphasis added).[2]

---

**1.** Coincidentally the trust at issue in *Harrington* was drafted in 1923, the same year the Daniels' trust was amended to become irrevocable.

**2.** This rule is consistent with the one applied by statutes and case law regarding pretermitted heirs. Minn.Stat. § 525.201 (1974) has remained essentially the same since 1905. The statute reads:

If a testator omits to provide in his will for any of his children or the issue of a deceased child, they shall take the same share of his estate which they would have taken if he had died intestate unless it appears that such

omission was intentional and not occasioned by accident or mistake.

This court very early declared that

The power to disinherit a posthumous child entirely is taken away, and the right of such child to inherit is absolute unless the father has made provision for it 'in his will or otherwise' * * *. Under the present statute, * * * the burden is upon those who claim that such omission was intentional, to establish that fact.

*Whitby v. Motz,* 125 Minn. 40, 43, 145 N.W. 623, 625 (1914). This statute was held to apply to adopted children in *Bakke v. Bakke,* 175 Minn. 193, 220 N.W. 601 (1928).

Our first task, therefore, is to construe the trust instrument itself. Two phrases in Article XI of the trust are at issue: "If any child or children are hereafter born to the said Thomas L. Daniels and Frances H. Daniels," and "The term issue shall not include adopted children."

■ Our recent decision, *In Re Trusts Created by Will of Hartman*, 347 N.W.2d 480, 485 (Minn.1984), held that the words "child" and "children" refer to the first generation, not to grandchildren. We have previously held that the word "children" includes adopted children. *In Re Trusteeship Under Agreement with Nash*, 265 Minn. 412, 416, 122 N.W.2d 104, 107 (1963). The terms of the Daniels trust instrument state: "if any of the children of Thomas L. and Frances H. Daniels shall die, * * * leaving a spouse or issue * * * the survivors of such spouse or issue * * *." By those terms the word "issue" refers to the second generation, i.e. the grandchildren of Thomas and Frances. Those *grandchildren* who have been adopted are clearly and explicitly excluded from beneficiary status: "The term 'issue' shall not include adopted children." Since there is no similar language relating to *children*, the language which remains to be construed then is "children hereafter born to the said Thomas L. Daniels and Frances H. Daniels * * *."

■ Despite testimony by Prof. Halbach[3] and others that this language specifically excludes adoptees, we believe the trial court is correct in holding that the trust instrument does not explicitly exclude adopted children other than those in the class specifically excluded. Our prior decisions with regard to adoptees support this conclusion.

In *Harrington* we held that the phrase "issue of her body" is not sufficiently explicit to exclude adoptees. 311 Minn. at

410, 250 N.W.2d at 167. The will involved in *Harrington* also used the phrases "if any be born after my decease," and, "if any children be born to my said daughter" and "if any such after-born child or children." *Id.* at 411–12, 250 N.W.2d at 168. While the holding of *Harrington* did not specifically rule on these phrases, implicit in the opinion is the recognition that the use of the word "born to" does not exclude adoptees.

The earlier *Nash* case held that "the phrase 'hereafter born' was obviously intended to include those who might become children of the life tenant before the termination of the trust. It does not * * * negative the possibility of adopted children." 265 Minn. at 419, 122 N.W.2d at 109.

The first case in Minnesota to hold that "lawful issue" is a technical phrase designating a class to which adoptees belong was *In re Trust Under Will of Holden*, 207 Minn. 211, 291 N.W. 104 (1940). The *Holden* court reasoned that the adoption statute "gives to an adopted child the status of a child of the body of the adoptive parent. * * * The artificial relation is given the same effect as the natural one. The adopted child is a lineal descendant." 207 Minn. at 216, 291 N.W. at 107 (citations omitted). The same rationale applies to the designation of "children hereafter born to" as a technical phrase delineating a class to which adoptees belong.

3. In adding the sentence "[t]he term 'issue' shall not include adopted children", the draftsman of the Daniels trust proved he gave conscious thought to future generations of adoptees and knew how to exclude them with explicit language. Minnesota leads the country with its strong statutory policy favoring the inheritance rights of adoptees. Minn.Stat. § 259.29, subd. 1, provides:

Upon adoption, the child shall become the legal child of the adopting persons and

---

3. Prof. Halbach's article, *The Rights of Adopted Children under Class Gifts*, 50 Iowa L.Rev. 971 (1965), was quoted at length in *Harrington* for the proposition that draftsmen's uses of terms of art are often habitual rather than part of a conscious design to exclude adopted children.

*Harrington*, 311 Minn., at 410–11, 250 N.W.2d at 167. Therefore, he wrote "[I]t is not too much to ask [him] to address himself specifically and unambiguously to this question before finding that the exclusion of an adoptee is intended." *Halbach* at 980–81 n. 43.

they shall become the legal parents of the child with *all the rights* and duties between them of natural parents and legitimate child. By virtue of the adoption the child shall inherit from the adoptive parents or their relatives the same as though the child were the natural child of the parents, * * *.

Minn.Stat. § 259.29, subd. 1 (1982) (emphasis added). The language of this adoption statute was virtually the same in 1923 when the critical amendment was drafted.[4]

There was no need here to write a specific inclusion clause, but if the settlor wished to exclude adopted children, a specific exclusion would have been required. Even the legal research books of the day were recommending that the word children should be held to *include* adopted children "unless a contrary intention is clearly manifested by the will." M.B. Dunnell, Minnesota Probate Law 191, 193 (1922).

■ 4. The John W. Daniels Trust instrument, we hold, does not by its terms specifically exclude adopted children from beneficiary status. We next look to the extrinsic evidence presented to try to ascertain the settlors' intent at the time the instrument was drafted. In view of the family members' consistent beliefs with regard to ownership and the evidence at trial that John had transferred assets to Tom prior to the establishment of the trust, the trial judge's conclusion that John W. had control and beneficial ownership of all assets contributed and that Tom and Amelia possessed legal title to certain assets but not control or beneficial ownership of any trust assets is supported by substantial evidence. John W. was, therefore, the principal settlor and since it was he who worked with the attorney in drafting the agreement, it is his intent that most matters. Because John W. died prior to Carol's adoption, any evidence of his intent must be garnered from the process of drafting the instrument.[5]

There were only two documents submitted at trial which related tenuously to John W.'s intent: A letter from the drafting attorney with comments about the proposed amendment indicating that the purpose of the changes in Article XI was to avoid probate and inheritance taxes. The letter added: "I have taken some things for granted in attempting, in Article XI, to provide who shall succeed to the shares of deceased beneficiaries. It may well be that this does not carry out your wishes, and I shall be glad to correct it if necessary." There is no evidence that John W. responded to this letter.

In a family history book written in 1980, Carol's brother John H. Daniels speculated, contrary to his position as appellant in this case, that the purpose of the "born to" language was to cement the marriage of Tom and Frances. He wrote:

It is also possible that the parents [John W. Daniels and Amelia L. Daniels] knew that Tom was witty and charming, and by some accounts had a roving eye. One conclusion is that one of the reasons for Frances' inclusion in the Trust was to provide a cement to hold the marriage together. With Frances and her sons as equal beneficiaries the penalties of a broken marriage would have had a severe impact on Tom.

John H. Daniels, "Dear Ones" from Piqua 44 (1980).

4. Minn.Revised L., ch. 73, § 3616 (1905) read: Status of adopted child—Upon adoption such child shall become the legal child of the persons adopting him, and they shall become his legal parents, with all the rights and duties between them of natural parents and legitimate child. By virtue of such adoption, he shall inherit from his adopting parents or their relatives the same as though he were the legitimate child of such parents, and shall not owe his natural parents or their relatives any legal duty; and, in case of his death intestate, the adopting parents and their relatives shall inherit his estate, as if they had been his parents and relatives in fact.

The language of Minn.Gen.Stat. ch. 73, § 8630 (1923) is almost identical.

5. Amelia Luzaich's testimony that Tom told her he remembered sitting at his father's right arm many times and discussing Carol's being excluded cannot be relied upon because John died before Carol was even born much less adopted.

Carol's brothers, John H., and David Daniels, and Amelia Luzaich all agreed on cross-examination that the same type of speculation had been family gossip for many years. There is no other evidence of John W.'s intent as to adopted children. It is highly unlikely he even considered their possibility since his daughter-in-law, Frances, was young and healthy at the time, had already delivered two babies, and was capable of having more natural children.[6]

The evidence as to Tom's intent was largely hearsay. He frequently told Carol and others that she was not part of the trust estate. Appellants insist that Tom used the words "everyone had always understood *and intended* that adopted children were not beneficiaries." In contrast, there was testimony by Amelia Luzaich on cross-examination to the effect that Tom at times asserted that he wished Carol was a beneficiary. All of the witnesses agreed that he always treated his adopted daughter as equal to his other children in every way.

The evidence of intent to exclude adopted children as beneficiaries is even less compelling with regard to Amelia and Frances. Amelia was alive when Carol was adopted and she did not alter her will which left her estate to her son Tom or if he predeceased her, to his "child or children * * * share and share alike." Carol was left Amelia's jewelry in the will. Frances' will specifically defined "child," "children," and "issue," who were to take the residue of her estate, to include adopted children. The finding below that the four subscribers did not intend to exclude adopted children of Tom and Frances as beneficiaries is clearly supported by substantial evidence.

Moreover there is considerable evidence in the record that the family members' convictions about Carol's status were based on a simple misunderstanding as to which was the relevant language. During cross-examination John H. admitted that from 1969 when he first read the trust instrument to 1979 when suit was brought, he was under the mistaken impression that the phrase: "The term 'issue' shall not include adopted children" applied to Carol rather than to succeeding generations.

Centuries of common law case law have established the right of a settlor or testator to dispose of his or her property as he or she deems fit. *See In re Trusteeship under Agreement with Mayo,* 259 Minn. 91, 95, 105 N.W.2d 900, 903 (1960) ("One of the court's highest duties is to give effect to the donor's dominant intention as gathered from the instrument as a whole.") But in this case, the trustees have not established by a preponderance of the evidence that the subscribers to the trust had the intent to exclude an adopted child.[7]

We hold that Carol Daniels Toombs is entitled to beneficiary status under the terms of the John W. Daniels trust agreement.

5. The statute of limitations applicable to this action is Minn.Stat. § 541.05, subd. 1, sections (6) or (7), as follows:

> Except where the uniform commercial code otherwise prescribes, the following actions shall be commenced within six years:
>
> .   *   *   *   *   *   *   .
>
> (6) For relief on the ground of fraud, in which case the cause of action shall not be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud;
>
> (7) To enforce a trust or compel a trustee to account, where he has neglected to discharge the trust, or claims to have

---

**6.** Tom and Francis Daniels had two sons by 1923 when the trust became irrevocable. Forrest was born January 8, 1919, and died July 16, 1967. John was born October 28, 1921, and is one of the appellants herein.

**7.** "The words of a will should be construed in accordance with precedents and statutes unless it is established *by a preponderance of evidence* that a testator intended some other meaning." *Harrington,* 311 Minn., at 408, 250 N.W.2d at 166 (quoting, *In re Trust Created by Will of Patrick,* 259 Minn. 193, 195, 106 N.W.2d 888, 890 (1960)) (emphasis added).

fully performed it, or has repudiated the trust relation; * * *.

The trial court judge seems to have applied an amalgam of the two subsections in holding that the statute of limitations applicable to an action to enforce a trust does not begin to run until *discovery of the breach* of trust.

The trustees argue that under Minn.Stat. § 541.05, subd. 1(7), the statute of limitations begins to run when the trustee has repudiated the trust relation. They claim that the trust relation was repudiated on the day of Carol's adoption when she was apportioned no interest in the trust. Assuming the running of the statute was tolled during her minority, she was obliged to bring her action within one year of attaining her majority, in 1956.

Alternatively, the trustees claim that Carol was put on notice of her claim in 1969 when she first asked Amelia Luzaich if she could see the trust instrument so that the statute of limitations began to run at that time.

■ The general rule is that ignorance of a cause of action which does not involve continuing negligence or trespass or fraud does not prevent the running of the statute of limitations. *See City of Coon Rapids v. Suburban Engineering, Inc.*, 283 Minn. 151, 167 N.W.2d 493 (1969); *Dalton v. Dow Chemical Co.*, 280 Minn. 147, 158 N.W.2d 580 (1968). The 6-year period begins to run when the facts constituting fraud were discovered or, by reasonable diligence, should have been discovered. Delay in discovering fraud may be excusable when a confidential relationship exists. The existence of a fiduciary relationship is a question of fact. *Murphy v. Country House, Inc.*, 307 Minn. 344, 240 N.W.2d 507 (1976). The court in *Murphy* declared that if a fiduciary duty existed the fiduciary could "be liable for fraudulent misrepresentation by silence even though there was no evidence of fraudulent statements or of intentional concealment." 307 Minn. at 350, 240 N.W.2d at 512 (citing W. Prosser, The Law of Torts § 106 (4th ed. 1971)).

■ The trial court found that a fiduciary relationship existed between Carol and the trustees. There is substantial support in the record for this finding. In addition to having a familial relationship with two of the trustees, Carol had given complete control of her financial affairs to Amelia Luzaich. A fiduciary relationship exists "when confidence is reposed on one side and there is resulting superiority and influence on the other; and the relation and duties involved in it need not be legal, but may be moral, social, domestic, or merely personal." *Stark v. Equitable Life Assur. Society*, 205 Minn. 138, 145, 285 N.W. 466, 470 (1939) (citations omitted). We have also declared: "Disparity of business experience and invited confidence could be a legally sufficient basis for finding a fiduciary relationship * * *." *Murphy*, 307 Minn. at 352, 240 N.W.2d at 512. Both Amelia Luzaich and Harley Hyre, an earlier trustee now deceased, had legal training and had read the *Nash* and the *Harrington* decisions. The trustees had greater access to facts and legal resources and had consulted attorneys about Carol's status. As the trial court held, this knowledge, combined with the confidential relationships, led to a fiduciary duty to reveal to Carol facts material to her beneficial interest.

■ The time when fraud reasonably should have been discovered is also a question of fact. *Murphy*, 307 Minn. at 351, 240 N.W.2d at 512. Judge Fitzgerald found that from 1969, when Carol first asked to see the trust instrument, until 1977, the trustees knew there was a chance that a court might declare Carol a beneficiary, but they chose not to go to court to determine Carol's status and they never informed her of these facts. Carol was found to have reasonably relied on the advice of the trustees and her family and to have never knowingly or intentionally given up her rights as a beneficiary or intentionally delayed bringing suit. She saw an attorney after her father died and she realized she could no longer count on him for support should she encounter financial difficulties. Upon being advised she had a

claim, she immediately brought suit. In view of the fiduciary relationship between Carol and the trustees and their fraudulent misrepresentations by silence, the statute of limitations under Minn.Stat. § 541.05, subd. 1, section (6), did not begin to run until Carol was advised by her attorneys to bring this action.

6. Moreover, there are Minnesota cases holding that a trust is a continuing relationship such that the statute of limitations does not begin to run until the accrual of the plaintiff's right to demand an accounting or enforce the trust. *Jones v. Hammond*, 168 Minn. 131, 209 N.W. 864 (1926). An action against an executor or an administrator and his bondsman accrues on the date of the final decree of distribution. *Burns v. New Amsterdam Casualty Co.*, 205 Minn. 391, 285 N.W. 885 (1939); *Ganser v. Ganser*, 83 Minn. 199, 86 N.W. 18 (1901). The Eighth Circuit Court of Appeals applied Minnesota law in an action against the managing advisor of an express trust in *Warner v. First National Bank of Mpls.*, 236 F.2d 853 (8th Cir.), *cert. denied*, 352 U.S. 927, 77 S.Ct. 226, 1 L.Ed.2d 162 (1956). The circuit court held that under Minnesota law the statute of limitations began to run on April 18, 1947, the date of the final accounting and distribution of the remaining assets of the trust to the residuary trustee. 236 F.2d at 860–61. The action in *Warner* was brought more than 6 years after that date but less than 6 years after the executors had been discharged. Since there were no allegations of any concealment or fraud practiced upon the executors by the managing advisor that would toll the statute and since the plaintiff had not met his burden of proving he did not discover the facts on which his rights were based within the statutory period, the statute of limitations was held to bar the action. The rule enunciated in *Warner* is correct. The statute of limitations with regard to actions on the corpus of an express trust under Minn.Stat. § 541.05, subd. 1, section (7), does not begin to run until the final date of distribution of the corpus of the trust, in this case, in 1998. The continuing nature of the rela-

tionship between the parties as well as the fiduciary aspects dictate such a rule which is more fair and reasonable than to demand proof of fraud or misrepresentation in every case.

Similarly the statute of limitations as to the various income distributions over the years began to run as to each distribution when the right to receive the particular payment was repudiated. *See Warner*, 236 F.2d at 862 (statute commenced to run upon each wrongful repudiation of the trust at the time it was committed); *Sippell v. Hayes*, 189 Misc. 656, 663, 69 N.Y. S.2d 852, 858 (N.Y.Sup.Ct.1947) (statute of limitations began to run when defendants failed to make quarterly installment, thus repudiating the trust obligation, recovery of any payments that became due more than 10 years before the commencement of action was barred). Accordingly, we hold that the statute of limitations as to each distribution of trust income prior to October 4, 1973, had run by 1979 when Carol filed suit. Her award should be modified to include only the distributions made from that day forward.

7. In a case involving a trust "[i]nterest is awarded upon equitable principles as compensation to the *cestui* to make him whole." *In Re Trust Under Will of Koffend*, 218 Minn. 206, 226, 15 N.W.2d 590, 601 (1944). Interest awarded under Minn.Stat. § 334.01 (Supp.1983) is considered a substitute for income the beneficiary might have earned so as to make him or her whole if the amount of damages is readily ascertainable and if there is an equitable basis for the award. In the case at issue, the trial court did not find any wrongful withholding as was the equitable rationale upon which the interest award in *Koffend* was based. The evidence at trial on the question of whether there was any deliberate wrongful withholding of information from Carol consisted (aside from a showing that the trustees had consulted with an attorney) mainly of handwritten notes Amelia Luzaich had written to herself in 1969. Amelia was concerned about

the possibility of involving the trust in litigation. These notes reveal that Amelia knew Carol had a good case against the trust and would probably bring suit once her father died. She also expressed concern about the cost to the trust of any litigation. In view of the fiduciary relationship between Carol and the trustees and the general rule that interest is to be awarded upon liquidated damages, we reverse the trial court on this issue. We therefore remand to the trial court for a determination of the amount of income distribution plus interest since 1973, to which Carol Daniels Toombs is entitled in addition to her share of future distributions of trust income and corpus.

Affirmed in part and reversed and remanded in part.

COYNE, Justice (dissenting).

I respectfully dissent. The primary purpose to be served in the analysis of a trust, as the majority acknowledges, is to ascertain and give effect to the intent of the settlors. The search for that intent should begin with the language of the instrument; and when the trust language is plain and clear, the search should end there. *In re Trust Known as Great Northern Iron Ore Properties*, 308 Minn. 221, 227, 243 N.W.2d 302, 306 (1976) *cert. denied*, 429 U.S. 1001, 97 S.Ct. 530, 50 L.Ed.2d 612 (1976), subsequently *appealed*, 263 N.W.2d 610 (Minn. 1978), *cert. denied*, 439 U.S. 835, 99 S.Ct. 116, 58 L.Ed.2d 130 (1978). In my opinion the settlors of the John W. Daniels' trust clearly and unambiguously expressed in the 1923 amendment to the trust instrument an intention to limit the class of future beneficiaries to the natural or biological children of Thomas L. Daniels and Frances H. Daniels. Hence, there is no room for construction. Neither is there need to resort to extrinsic evidence of the settlor's intent. Indeed, the consideration of extrinsic evidence is impermissible. *Id. In Re Campbell's Trusts*, 258 N.W.2d 856, 841 (Minn.1977).

Adoption, unknown at common law, is solely a creature of statute. Minnesota's original adoption statute created a new status, establishing between persons not so related by nature the legal relationship of child and parent, "the same as if he had been born to them in lawful wedlock." Act of February 26, 1876, ch. XCI, § 6, 1876 Minn.Gen.Laws 107, 108. *See In re Adoption of Zavasky (Petition of Sherman)*, 241 Minn. 447, 451, 63 N.W.2d 573, 576 (1954). Although early adoption statutes limited the child's right of inheritance from his adoptive parents and their relatives, since 1905 the child inherits from the adoptive parents and their relatives "the same as though he were" the legitimate or natural child of the adoptive parents, and the adoptive parents and their relatives inherit the child's estate "as if they had been" his parents and relatives in fact. Minn.Revised L., ch. 73, § 3616 (1905); Minn.Stat. § 259.29 (1982). Thus, since 1905 an adopted child has been a "child" of the decedent within the purview of the laws of intestate succession. The law of intestate succession, however, is not determinative of the intention of the settlor of a trust.

Because adoption statutes are in derogation of the common law, a majority of courts initially took a somewhat restrictive view of the status of an adopted child. In Minnesota, however, we long ago came to the realization that the family relationship is far more the product of love, understanding, and the mutual recognition of reciprocal duties and bonds, than of the biological act of begetting offspring. *In re Trust Created by Will of Patrick*, 259 Minn. 193, 196, 106 N.W.2d 888, 890 (1960). As a corollary of that recognition, adopted children have been accorded the same position as biological children, including not only their right to inherit by laws of intestate succession but also the right to inherit by appropriate testamentary provisions. *In re Estate of Youmans*, 218 Minn. 172, 180, 15 N.W.2d 537, 541 (1944).

Where the purpose to grant or withhold benefits with respect to adopted children is not clear, it is presumed that the settlor or testator intended to include adopted children within the grant. *In re Trust Creat-*

ed by the *Will of Patrick,* 259 Minn. 193, 195–96, 106 N.W.2d 888, 890 (1960). The unqualified word "children" is simply presumed to include both biological and adopted children. The adopted child has long been recognized as a lineal descendant, *In re Sutton's Estate,* 161 Minn. 426, 201 N.W. 925 (1925); an heir at law, *Bakke v. Bakke,* 175 Minn. 193, 220 N.W. 601 (1928); and next of kin of his adoptive parents, *McKeown v. Argetsinger,* 202 Minn. 595, 279 N.W. 402 (1938). Even absent formal adoption proceedings, a young man was deemed to have been intended to take under a will as a descendant of his de facto adoptive father. *In re Trust Created by Will of Patrick,* 259 Minn. 193, 106 N.W.2d 888 (1960). The terms "issue" and "lawful issue" or "legal issue" have been held to have a technical meaning which comprehends an adopted child, *In re Trust under Will of Holden,* 207 Minn. 211, 291 N.W. 104 (1940), and an illegitimate child, *Northwestern National Bank of Minneapolis v. Simons,* 308 Minn. 243, 242 N.W.2d 78 (1976). Adopted children are included in the category of "children of" and "issue of" a life tenant "who may hereafter be born". *In re Trusteeship under Agreement with Nash,* 265 Minn. 412, 122 N.W.2d 104 (1963). More recently, we held that the use of the term "issue of her body" without further elaboration did not evince an intent to include only natural born children of the settlor's daughter and to exclude an adopted child from the benefits of the trust. "To hold otherwise would cast a cloud over this state's policy toward adopted children and add to the reports another mindless case based on sham 'intent' manifested in virtually meaningless common-law phrases." *In re Trusts Created by Agreement with Harrington,* 311 Minn. 403, 250 N.W.2d 163 (1977).

It is apparent from the foregoing that the Minnesota policy in favor of adopted children is one of unique power. Nevertheless, although the adoption statute may establish the legal relationship of parent and child, it cannot abrogate the laws of nature by providing that those who are not children of the blood shall be so in fact.

*McKeown v. Argetsinger,* 202 Minn. 595, 598, 279 N.W. 402, 404 (1938). Nor does the adoption statute attempt the impossible; the statute creates rights of inheritance between the adopted child and his adoptive parents and their relatives "the same as though" or "as if" they were related in fact, even though they are not. Minn.Stat. § 259.29, subd. 1 (1982).

Furthermore, although the law may designate the persons entitled to inherit in cases of intestacy, a testator or the settlor of a trust, in the free exercise of his will, may limit the benefits of his estate to persons of his choice. *In re Trusteeship Created by Fiske,* 242 Minn. 452, 65 N.W.2d 906 (1954). He may designate the "children of" the settlor as beneficiaries, thus including both natural and adopted children in the class of beneficiaries; or he may exclude them. He may designate "the children adopted by" the settlor, to the exclusion of his natural children. Or he may designate "the children born to" the settlor as beneficiaries, thus, on any literal reading of the phrase, excluding adopted children. The language is perfectly ordinary and straightforward. The man on the street speaks of his children and grandchildren; a reference to his issue would be extraordinary. The terms "issue," "legal issue," and "issue of her body" are technical, common-law phrases which may well be characterized as virtually meaningless to all but lawyers. "Children", however, is a word of common usage, as is the term "born to". To lawyers and non-lawyers alike the phrase "children hereafter born to" X and Y has a plain and unmistakable meaning: the biological children of X and Y.

In arriving at the intent of the settlors of a trust a court is not at liberty to disregard the plain language employed in the trust instrument, to insert or add words, to substitute other words for those used, or to engraft inconsistent limitations on the terms of the trust. No matter how ill-advised or how much at odds with public policy we regard the terms of the trust, it is fundamental that the words used must

be given their ordinary meaning unless it clearly appears that they were otherwise used. *In re Trusteeship Created by Fiske,* 242 Minn. 452, 65 N.W.2d 906 (1954). The words "children hereafter born to the said Thomas L. Daniels and Frances H. Daniels" conveyed a plain and ordinary meaning—the natural or biological children of Thomas and Frances Daniels—when the settlors employed them in 1923, and they convey the same unambiguous message today. Since the meaning is clear, there is no need to seek intent in public policy; indeed, we are precluded from doing so. *Id.* at 460, 65 N.W.2d at 910–11.

That the words were used in their ordinary sense is confirmed by the context in which they appear. The words "children hereafter born to" referred to the children of Thomas and Frances Daniels. Beneficial provisions for subsequent generations referred to "issue", and concluded with the provision, "The term 'issue' shall not include adopted children." While the majority regards this specific exclusion of adopted children from the class of grandchildren and subsequent descendants of Thomas and Frances as indicative of an intent to include adopted children in the class of children born to them, that seems to me an unreasonable inference productive of an absurd result. Apart from ignoring the plain reference to biological children, the majority position attributes to the settlors an intention to include as beneficiaries any children whom Thomas and Frances Daniels might later adopt while at the same time excluding from beneficial enjoyment of the trust estate any adopted grandchildren or great grandchildren. It is far more likely that the settlors intended to treat adopted children the same regardless of the generation to which they happened to belong.

Moreover, although there is no basis for seeking intent in extrinsic evidence, it is not amiss to point out that the conduct of the settlors was consistent with an intention to limit the class of beneficiaries to biological offspring. When a third son, David, was born to Thomas and Frances in 1927, he immediately joined his older broth-

ers, both of whom were named in the instrument, as trust beneficiaries. When Carol was adopted in 1936, neither of the then living settlors-trustees caused Carol to be numbered among the trust beneficiaries. While expressing the wish that Carol were a beneficiary, Thomas frequently told Carol and others that she was not a beneficiary.

Because I am forced to conclude, albeit with considerable reluctance, that the settlors clearly expressed their intention to include only biological children and issue as beneficiaries of the trust, I would reverse the judgment of the district court.

KELLEY, Justice (dissenting).

I join the dissent of Justice Coyne.