# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 07-671

## MARK SAMPSON AND ALFREDA COLEMAN SAMPSON

## VERSUS

## DCI OF ALEXANDRIA, ET AL

**********

APPEAL FROM THE
TENTH JUDICIAL DISTRICT COURT
PARISH OF NATCHITOCHES, NO. 78,912
HONORABLE DEE A. HAWTHORNE, DISTRICT JUDGE

**********

### J. DAVID PAINTER

**********

Court composed of Oswald A. Decuir, Elizabeth A. Pickett, and J. David Painter, Judges.

**AFFIRMED AS AMENDED.**

William F. Henderson
Attorney at Law
910 Foisy Avenue
Alexandria, LA 71301
Counsel for Defendant-Appellant
        DCI of Alexandria, Inc.

Mark L. Roberts
McCoy, Roberts & Begnaud, Ltd.
300 St. Denis Street
Natchitoches, LA 71457
Counsel for Plaintiff-Appellee
        Mark and Alfreda Sampson

PAINTER, Judge.

Defendant, DCI of Alexandria (DCI), appeals the trial court's judgment in favor of the plaintiffs, Mark and Alfreda Sampson, in the amount of $45,495.95 and the court's denial of its reconventional demand for $20,906.28, representing the balance allegedly due under a building contract.

FACTS AND PROCEDURAL HISTORY

On May 11, 2004, the parties entered a fixed-sum contract to build a house for the Sampsons. Under the term of the contract DCI agreed, in exchange for $90,000.00, to:

> "furnish all LABOR, AND TOOLS necessary to construct proposed building according to plans and specifications, provided by owner as specified below:

> FOR FOUNDATIONS, FRAMING AND TRIM OUT<br>OF DWELLING

> ALL MATERIAL AND EQUIPMENT ARE TO BE FURNISHED BY OWNER. All work to be completed in a workmanlike manner according to standard practices. ANY ALTERATION OR DEVIATION FROM ABOVE SPECIFICATIONS INVOLVING EXTRA COSTS WILL BE EXECUTED ONLY UPON WRITTEN CHANGE ORDERS, AND WILL BECOME AN EXTRA CHARGE OVER AND ABOVE THIS CONTRACT AMOUNT TO BE PAID 50% UPON ACCEPTANCE AND 50% UPON COMPLETION OF EACH CHANGE ORDER. The contractor shall guarantee his work for a period of (1) year from date of final acceptance by the owner. This condition does not invalidate longer periods of warranty for equipment furnished by the manufacturer with longer periods of warranty. It is agreed NO OCCUPANCY OF DWELLING SHALL BE PERMITTED UNTIL FINAL PAYMENT OF CONTRACT & ALL CHANGE ORDERS HAVE BEEN PAID IN FULL. All agreements are contingent upon strikes, accidents, or delays beyond our control. The Contractor will carry General Liability Insurance. Owner to carry fire, tornado, and other necessary insurances. Our workers are fully covered by Workmen's Compensation Insurance.

The following is undisputed: Alfreda Sampson tried to buy builder's risk insurance as required by the contract but found the prices to be prohibitively high.

When she discussed this with Mike Dunn, sole shareholder and operator of DCI , he offered to obtain the insurance for a better price. He obtained the policy, and the Sampsons paid the premium. However, when Dunn obtained the policy he named DCI as the beneficiary.

Construction began with building materials supplied by the Sampsons. On September 28, 2004, DCI sent an invoice to the Sampsons showing charges as follows:

| | |
|---|---|
| Foundation in Place | $22,500.00 |
| Builders Risk Policy | $ 910.00 |
| Termite Company | $ 1,153.77 |
| Dirt Work | $ 5,500.00 |
| Concrete Finishers | $ 4,391.00 |

The Sampsons made a payment of $30,063.77 on October 1, 2004, which did not include payment of the amount for the concrete finishers, because the Sampsons felt that the contract made DCI responsible for providing that service.

On November 23, 2004, a storm damaged or destroyed the partially constructed house. DCI made a claim against the builder's risk policy for damages in the amount of $23,221.11. Dunn testified that the claim included amounts as follows:

| | |
|---|---|
| Materials | $ 5,709.00 |
| Labor to remove and sort damaged materials | $ 3,024.00 |
| Labor to reframe roof | $ 6,430.00 |
| Overhead and supervision | $ 3,350.00 |
| Workers' compensation and general liability insurance and taxes | $ 3,456.00 |
| Profit | $ 2,201.92 |

2

These amounts were reduced by the policy deductible of $1,000.00. The insurance company deducted the amount claimed as profit and sent a check for $21,019.19 to DCI. DCI kept the proceeds of the insurance check.

DCI began rebuilding the house, but, on January 12, 2005, another storm destroyed the house, which was eighty-seven percent complete according to DCI's claim. DCI again made a claim against the builders's risk insurance for the following amounts:

| | |
|---|---|
| Materials | $45,021.77 |
| Labor | $35,697.52 |
| Insurances | $10,341.57 |
| Matching Funds | $ 1,341.57 |
| Supervision | $ 9,000.00 |
| Insurances on Supervision | $ 619.26 |
| Matching Funds on Supervision | $ 688.00 |
| Overhead (10%) | $10,275.40 |
| Profit | $10,275.40 |
| Demolition | $ 5,756.00 |

DCI began rebuilding the house, and on May 23, 2005 sent the Sampsons an invoice showing the following charges:

| | |
|---|---|
| Framing labor | $58,500.00 |
| Concrete Finishers (not included in layout and forming labor) | $ 4,391.00 |
| Concrete Finishers for Patio | $ 882.00 |
| Lowes for windows | $ 2,039.80 |
| Stine Lumber wood for windows | $ 310.46 |
| Coburn Supply Stove Top & Chimney Hood | $ 2,454.37 |
| Payment Received | $68,000.00 |
| | |
| Final 10% Due Upon Completion | $ 9,000.00 |

3

On May 31, 2005, the Sampsons paid $60,000.00 but, according to the testimony of Mrs. Sampson, deliberately left out the amounts for the concrete finishers. On July 20, 2005, they made another payment of $8,000.00.

The Sampsons were billed $29,800.00 in connection with the heating and air conditioning installation. The parties do not dispute that this item was not covered by the contract between the Sampsons and DCI. However, DCI hired the subcontractor, paid them, and billed the Sampsons for the work. DCI admits that it added a $6,000.00 mark-up to the bill for the subcontractor's work.

After the second storm, while attempting to settle the insurance claim, DCI filed a lien against the Sampsons for $150,557.71. The insurance company sent Dunn a check in the amount of $117,528.74 made payable to Dunn and the mortgage holder, Hancock Bank. The Sampsons filed a petition seeking cancellation of the lien, damages and attorney's fees for the wrongful filing of the lien, damages for defective workmanship, reimbursement of the value of the salvage materials, and reimbursement of an overpayment made to DCI by the builder's risk insurer. DCI filed a reconventional demand seeking to recover amounts allegedly still owed to it under the building contract, as well as attorney's fees.

After a trial on the merits, the court rendered judgment in favor of the Sampsons in the amount of $45,495.95 plus costs and attorney's fees. It further denied DCI's reconventional demands. The court gave extensive written reasons for its decision. DCI appeals.

4

*Insurance*

We first consider the question of the ownership of the insurance policy and its proceeds as this will determine whether DCI has received full payment. DCI asserts that the trial court erred in finding that the builder's risk policy covered the Sampsons and that the Sampsons still owed money on the original contract. It argues that the trial court improperly reformed the policy to make it payable to the Sampsons where DCI was the named beneficiary. The trial court found that the insurance proceeds belonged to the Sampsons and that they were the actual and intended beneficiaries of the policy. After reviewing the evidence of record, we conclude that Dunn and/or DCI breached a fiduciary duty to the Sampsons in its handling of the builder's risk policy and that the proper remedy for the breach of this duty is an award of the proceeds of the policy, minus appropriate credits for amounts needed to restore the house to its pre-storm condition.

When asked about the builder's risk insurance, Mrs. Sampson testified that:

> I went looking for builders risk and it was extremely expensive. I called Mike [Dunn] up and I explained to him how expensive. Well he said Ms. Sampson I can get builders risk a lot cheaper and just pay me the money.

Dunn testified as follows with regard to the purchase of the builder's risk policy:

> Most of the time, a builders risk is basically a homeowners policy. That's the reason we try to get it to go back to the homeowner. If they'll furnish it, which we requested that in this here too (sic). We requested that they purchase it, the builder's risk. And they decided that we could purchase it at a lesser amount of money. So that's the reason it came back to us. So when we purchased it they automatically made us a policy holder. And they, we were liable for the premiums on it and all the negotiations that went on.

It is undisputed that the Sampsons had the responsibility to furnish builder's risk insurance. It is further undisputed that DCI billed the Sampsons for the premiums on the builder's risk policy that it obtained and that the Sampsons paid that invoice.

In undertaking to obtain insurance for the Sampsons, DCI and/or Dunn became the mandatary of the Sampsons. "A mandate is a contract by which a person, the principal, confers authority on another person, the mandatary, to transact one or more affairs for the principal." La.Civ.Code art. 2989. "The mandatary is bound to fulfill with prudence and diligence the mandate he has accepted. He is responsible to the principal for the loss that the principal sustains as a result of the mandatary's failure to perform." La.Civ.Code art. 3001. It follows that as a mandatary, Dunn and/or DCI had a fiduciary duty to the Sampsons.

. Generally, whether a fiduciary duty exists, and the extent of that duty, depends upon the facts and circumstances of the case and the relationship of the parties. As a basic proposition, for a fiduciary duty to exist, there must be a fiduciary relationship between the parties. . .

A fiduciary relationship has been described as "one that exists 'when confidence is reposed on one side and there is resulting superiority and influence on the other.'" *Plaquemines Parish Commission Council v. Delta Development Company, Inc.*, 502 So.2d 1034, 1040 (La.1987), *quoting Toombs v. Daniels*, 361 N.W.2d 801, 809 (Minn.1985).

The word "fiduciary," as a noun, means one who holds a thing in trust for another, a trustee; a person holding the character of a trustee, or a character analogous to that of a trustee, with respect to the trust and confidence involved in it and the scrupulous good faith and candor which it requires; a person having the duty, created by his undertaking, to act primarily for another's benefit in matters connected with such undertaking.

*State v. Hagerty*, 251 La. 477, 492, 205 So.2d 369, 374 (1967), *quoting* 36A C.J.S. Fiduciary, p. 381. One is said to act in a fiduciary capacity "when the business which he transacts, or the money or property which he handles, is not his own or for his own benefit, but for the benefit of

6

another person, as to whom he stands in a relation implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other." *Hagerty*, 251 La. at 493, 205 So.2d at 374-375, *quoting* BLACK'S LAW DICTIONARY (4th ed.1951).

The term "fiduciary" is defined in the Uniform Fiduciaries Law, LSA-R.S. 9:3801(2), as follows:

"Fiduciary" includes a trustee under any trust, expressed, implied, resulting or constructive, executor, administrator, guardian, conservator, curator, receiver, trustee in bankruptcy, assignee for the benefit of creditors, partner, agent, officer of a corporation, public or private, public officer, or any other persons acting in a fiduciary capacity for any person, trust or estate.

The Uniform Fiduciaries Law appears in the Civil Law Ancillaries under **Code Title XV--Of Mandate**. By definition, a mandate is "a contract by which a person, the principal, confers authority on another person, the mandatary, to transact one or more affairs for the principal." LSA-C.C. art. 2989. The defining characteristic of a fiduciary relationship, therefore, is the special relationship of confidence or trust imposed by one in another who undertakes to act primarily for the benefit of the principal in a particular endeavor. *Plaquemines Parish Commission Council*, 502 So.2d at 1040; *Hagerty*, 251 La. at 493, 205 So.2d at 374-375.

*Scheffler v. Adams and Reese, LLP*, 06-1774, pp. 6-7 (La. 2/22/07), 950 So.2d 641, 647-48.

By failing to have the Sampsons listed as the beneficiaries of the builder's risk policy or to turn the settlement over to them, Dunn failed to fulfill his mandate with "prudence and diligence."

The fiduciary's duty includes the ordinary duties owed under tort principles, as well as a legally imposed duty which requires the fiduciary to handle the matter "as though it were his own affair." *Federal Deposit Insurance Corporation v. Caplan*, 874 F.Supp. 741, 744 (W.D.La.1995), quoting, *Noe v. Roussel*, 310 So.2d 806, 819 (La.1975). "In addition, the 'fiduciary may not take even the slightest advantage, but must zealously, diligently and honestly guard and champion the rights of his principal against all other persons whomsoever, and is bound not to act in antagonism, opposition or conflict with the interest of the principal to even the slightest extent.'" *Id.* It is this duty of loyalty which distinguishes the fiduciary relationship. *Gerdes*, 953 F.2d at 205. "A cause of action for breach of fiduciary duty requires proof of fraud,

7

breach of trust, or an action outside the limits of the fiduciary's authority." *Gerdes*, 953 F.2d at 205.

*Beckstrom v. Parnell*, 97-1200, pp. 8-9 (La.App. 1 Cir. 11/6/98), 730 So.2d 942, 947-48.

The Sampsons have shown a breach of the trust they placed in DCI. DCI failed in its duty not to take the slightest advantage of that trust. The trial court correctly concluded that the Sampsons should have received the proceeds of the insurance policy, because this is what would have occurred had DCI "zealously, diligently and honestly guard[ed] and champion[ed] the rights" of the Sampsons.

Having so found, it is necessary to consider DCI's claims as to amounts due under the contract and for items provided over and above those for which they contracted. DCI is entitled to its full contract payment of $90,000.00 plus the costs of rebuilding the premises to its pre-storm condition and any items it provided over and above those included in the contract, i.e., those items which were to be directly paid by the Sampsons.

1) Heating/Air Conditioning/Electrical Payment

DCI argues that it is due the full $29,800.00 it charged the Sampsons for the heating/air conditioning/electrical work for which it paid the subcontractor. It is undisputed that this work was not covered by the building contract and was to be paid by the Sampsons in addition to the contract price.

DCI obtained the services of a subcontractor on behalf of the Sampsons. The subcontractor charged DCI $23,800.00. DCI then added $6,000.00 to the bill and sent an invoice for $29,800.00 to the Sampsons. The trial court reduced the amount owed to DCI to the $23,800.00 charged by the subcontractor, stating that: "Dunn admitted that the Sampsons were unaware of, and did not agree to, the mark-up.

8

Given that Mr. Dunn had no contractual right to arbitrarily charge the Sampsons an additional $6,000.00, the Court finds that DCI is only entitled to the actual value of the subcontracting work, or $23,800.00." In light of the evidence at trial, we find no error in this determination by the trial court. Therefore, DCI is entitled to payment of only $23,800.00 for the heating/air conditioning/electrical subcontract.

2) Salvage Materials

DCI further asserts that the trial court erred in finding that the Sampsons were entitled to the value of the building materials salvaged from the ruined buildings. The court found that those materials belonged to the Sampsons and placed a value of $10,000.00 on them. Trial testimony revealed that after the storms destroyed the house, DCI allowed its employees to take the salvaged building materials. The Sampsons paid for the building materials and were the owners of the house. We agree with the trial court that the salvaged material belonged to them. However, no value of the materials was established at trial. As a result, the Sampsons failed to carry their burden of proof in regard to this claim. Therefore, the court erred in awarding the Sampsons a credit of $10,000.00 for the salvaged materials.

3) Concrete Finishers

DCI asserts that the trial court erred in finding that a payment by the Sampsons in the amount of $8,000.00 was not a payment of a charge for concrete finishers. DCI argues that the payments of $60,000.00 and $8,000.00 made on May 31, 2005 and July 20, 2005, respectively, can not be imputed to anything other than the second invoice dated May 23, 2005.

We agree with the trial court that:

DCI must pay for the concrete finishers under the contract. The contract states that DCI will furnish all labor and tools necessary to construct the

9

foundation. The Court finds that the concrete finishers are labor costs that are necessary to construct the foundation. Mr. Dunn admitted at trial that the concrete finishers are related to the foundation work and that there was no exclusion for the concrete finishers under the contract.

"A thing is not owed when it is paid or delivered for the discharge of an obligation that does not exist." La.Civ.Code. art. 2300. Therefore, under the building contract, the Sampsons did not owe any amount for concrete finishers. As a result, any payment credited against that amount was a credit against a debt not owed. La.Civ.Code art. 2299 states that: "A person who has received a payment or a thing not owed to him is bound to restore it to the person from whom he received it." Accordingly, the trial court correctly excluded the charges for the concrete finishers from the amounts owed to DCI.

*Amounts Paid and Amounts Due*[1]

The record establishes amounts due and amounts paid as follows:

PAYMENTS TO DCI:

| | | |
|---|---|---|
| Payments by the Sampsons: | $115,943.77 | |
| Insurance Proceeds Paid to DCI: | $138.647.93 | |
| Total Payments to DCI: | | $254,491.70 |

EXPENSES OF DCI NOT COVERED BY CONTRACT PRICE

Labor to return construction to pre-storm condition:

| | |
|---|---|
| First Storm: | $ 9,504.00 |
| Second Storm: | $ 35,640.00 |
| Materials: | $ 40,846.27 |

---

[1]Where amounts or items were not made the basis of an assignment of error, disputed, or considered by this court, we have used amounts taken from the trial court's reasons for judgment after review of the record for verification. Errors in computation made by the trial court have been corrected.

10

| | |
|---|---|
| Demolition: | $ 5,756.00 |
| Insurance Deductibles: | $ 2,000.00 |
| ADDITIONAL COSTS: | |
| Heating and Electrical | $ 23,800.00 |
| Dirt Work | $ 5,500.00 |
| Insurance Premiums | $ 910.00 |
| Termite Treatment | $ 1,153.77 |
| Windows: | $ 2, 039.80 |
| Window Casing Materials: | $ 310.00 |
| Stove Top and Hood: | $ 2,454.37 |
| TOTAL EXPENSES: | $128,996.65 |
| CONTRACT PRICE: | $ 90,000.00 |
| TOTAL DUE DCI: | $218,996.65 |
| REIMBURSEMENT DUE FROM DCI TO SAMPSONS: | $ 35,495.05 |

*Attorney's Fees*

DCI argues that the trial court erred in ordering it to pay attorney's fees in connection with the wrongful issuance of the lien and in failing to order the Sampsons to pay attorney's fees for breach of contract.

With regard to the attorney's fees for the failure to timely cancel the lien, DCI argues that the lien was proper because the Sampsons owed them money. Having found that, in fact, DCI owed a reimbursement to the Sampsons, we reject this argument. The trial court correctly found that the Sampsons are entitled to attorney's fees incurred in connection with their claim for wrongful filing of and/or failure to timely cancel the lien put on their property.

11

Having found no breach of contract on the part of the Sampsons, we find no error in the trial court's denial of attorney's fees in this regard.

CONCLUSION

For these reasons, the judgment of the trial court is amended to reflect that DCI owes a reimbursement of $35,495.05 to the Sampsons. In all other respects, the judgment is affirmed. Costs of this appeal are assessed to DCI.

**AFFIRMED AS AMENDED.**