STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

**16-503**

SUCCESSION OF JOE ANDY MCKINLEY

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. P-20140058
HONORABLE MARILYN CARR CASTLE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

SHANNON J. GREMILLION
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, John D. Saunders, and Shannon J. Gremillion, Judges.

**AFFIRMED WITH INSTRUCTIONS.**

James L. Brazee, Jr.
Evan T. Edwards
Brazee & Edwards
2901 Johnston Street, Suite206
Lafayette, LA 70503
(337) 237-0492
COUNSEL FOR APPELLANT:
    Kevin Jay McKinley

Theodore G. Edwards, IV
Robert D. Felder
Jordan T. Precht
Davidson, Meaux, Sonnier, McElligott, Fontenot, Gideon & Edwards
810S. Buchanan Street
Lafayette, LA 70501
(337) 237-1660
COUNSEL FOR APPELLEE:
    Kenneth Wayne McKinley

**GREMILLION, Judge.**

Kevin McKinley appeals the trial court's judgment ordering reimbursement to the estate of his father, Joe Andy McKinley, awarding ownership of a Browning "Sweet Sixteen" shotgun to his brother, Kenneth, and other matters related to the succession. For the following reasons, we affirm with instructions.

## FACTUAL AND PROCEDURAL BACKGROUND

Joe Andy McKinley died testate on January 24, 2014. The appellant, Kevin McKinley, and his brother, Kenneth McKinley, are the only surviving heirs of Joe. On January 27, 2014, Kenneth initiated the succession of his father by filing a petition for rule to show cause to appoint an administrator, for a temporary restraining order, and for succession inventory. On February 28, 2014, Kevin responded by filing a petition for rule to show cause to probate a notarial testament and for confirmation of an independent administrator, namely himself. Following a mediation, the brothers entered into a settlement agreement in July 2014. Subsequently, Kevin terminated his counsel and failed to move forward with the terms of the settlement agreement.

In September 2014, Kenneth filed a motion and order for telephone status conference and to enforce the settlement agreement. Kevin's former counsel, Steven G. Durio, filed a petition for intervention for the unpaid fees of $29,976.99 owed to his firm by Kevin.

In late October 2014, Kenneth filed a motion and order to reset the hearing to enforce the settlement agreement. Following a November 3, 2014 hearing, Kevin and Kenneth entered into a joint stipulation and consent judgment in which Kevin stipulated he would take various actions in accordance with settling the estate, such as composing lists and obtaining valuations, paying the monies owed to his former lawyer, and deferring the ownership of the Browning "Sweet

Sixteen" shotgun to future court proceedings. Further, claims for reimbursement would continue to be negotiated.

On January 12, 2015, Kenneth filed a motion and order to compel and for contempt for Kevin's failure to comply. On January 29, 2015, Durio filed a motion and order for attorney fees because his firm had yet to be paid for its services. Various motions were subsequently granted relating to the production of financial documents. On April 10, 2015, Durio again filed a motion and order for the payment of the fees owed to the firm by Kevin.

On May 15, 2015, Kevin filed a rule to show cause why he should not be reimbursed by the estate for the payment of the attorney fees as provided for in the Trust Agreement, urging that Kenneth was the "sole cause of the extensive litigation in this matter." He further urged that the monies owed Durio be paid out of the trust account and deducted from Kenneth's share.

On August 7, 2015, Kenneth filed a rule to show cause why he and/or the estate should not be reimbursed for estate monies expended by Kevin for his own personal benefit totaling $92,057.76. Kenneth further requested reimbursement for property taxes that he paid out of his personal funds for his father's home. Kenneth also requested reimbursement of assorted expenses incurred by Kevin.

On August 25, 2015, Kevin filed a rule for expedited partial distribution of funds as a portion of inheritance which Kenneth opposed. Kevin thereafter dismissed his motion. On September 28, 2015, Kevin filed an answer and objection to Kenneth's rule for reimbursement and Kevin filed motions for contempt, sanctions, attorney fees, and reimbursement. Kenneth thereafter filed oppositions to the motions.

On October 20, 2015, Kevin filed a motion for appointment of an independent administrator, for authority to act, and for contempt. On October 30,

2

2015, Kenneth filed a motion for expedited in-person status conference to address Kevin's new motion for contempt ("and the repeated personal attacks on Kenneth and counsel for Kenneth therein"). The trial court issued a judgment on rules following a hearing on October 26, 2015. The trial court overruled Kevin's exceptions of prescription, vagueness and ambiguity. It further ordered that Kevin's motion for contempt and sanctions would be deferred until after a trial on the merits of the reimbursement claims.

Following a bench trial in January 2016, the trial court found that Kevin breached his fiduciary duty owed to his father and ordered that Kevin reimburse the estate the sum of $39,441.94 for personal expenses paid for with his father's credit cards and checks he issued to himself in excess of his monthly allowance. The trial court also awarded the Browning "Sweet Sixteen" shotgun to Kenneth because his bid of $850.00 exceeded Kevin's bid of $777.00. The trial court ordered that Kenneth be reimbursed $1,320.69 for taxes he paid with personal funds on behalf of the estate. Finally, the trial court ordered that Kevin reimburse the estate $4,000.00 received in April 2014 as an allowance payment after his father's death. In its judgment, the trial court set forth various instructions for concluding succession matters. Kevin now appeals and assigns as error:

1. The Trial Court erred in finding that Appellant breached a fiduciary duty by self-dealing and ordering reimbursements against the Appellant.

2. The Trial Court erred in failing to uphold the provisions of the Trust by failing to reimburse attorney fees, court costs, and other expenses of the Appellant in direct contravention of the terms of Paragraph 4.9 of the Trust.

3. The Trial Court erred when it held that the Browning "Sweet Sixteen" Shotgun (hereinafter referred to as "the shotgun") had not previously been a completed donation or gift made to the Appellant, and ordered the parties to bid on the shotgun to establish ownership.

3

4. The Trial Court erred in failing to include a $14,528.654 reduction of Kenneth McKinley's share of his inheritance in its written ruling.

5. The Trial Court erred in finding that Appellant had caused a delay in removing Decedent's personal effects from Cornerstone Assisted Living (hereinafter referred to as "Cornerstone") and assessing the sum of $3,173.42 in rent against Appellant.

## DISCUSSION

The will executed by Joe in October 2005, stated in part:

I leave my entire estate to Trustee for the McKinley Living Trust of 2005, wherever said estate is situated at the time of my death. I declare that the distribution plan for assets held in said trust, of even date hereof, as amended or restated, should be incorporated into the Will in the event that the trust is revoked or held invalid.

I name Kenneth W. McKinley executor of my Will, to serve without bond.

Executor may act as Independent Administrator or Independent Executor pursuant to La.Code Civ. P. Art. 3396.2

On January 20, 2012, Joe executed a Codicil to his last will and testament which stated in part:

1) I hereby remove Kenneth W. McKinley as executor of my Will and replace with Kevin J. McKinley

2) With the exception of this change, my Will executed on October 28, 2005, shall remain in full force and effect.

Kevin McKinley testified that in September 2011, his father fell and required hospitalization. At the time, he was living in Virginia. Kevin thereafter moved to Louisiana; however, when asked if he came to Louisiana to help take care of his father he replied, "Not really." Kevin lived in his father's house rent-free while his father lived in various assisted living facilities, with the last one being Cornerstone. Kevin said that he used his father's vehicle and was given an allowance by his father of initially $3,000 per month that increased to $4,000 per

4

month. Kevin said that he paid a sitter to stay with his father for five hours a day five days a week out of his father's funds.

Kevin admitted that Kenneth had power of attorney in 2011, when their father was first hospitalized, and he would question Kevin as to funds he was using. Kevin said that he started talking to his father about changing the power of attorney to him, but his father's attorney refused to do so. Kevin found another attorney to draft a power of attorney naming him, and he picked his father up from the retirement home and drove him to the attorney's office so that the power of attorney could be executed in his favor. Kevin testified that his intention was only to revoke Kenneth's power of attorney and not to get one for himself. Kevin was questioned:

> Q. And, once that was done, you felt you could now use your father's money without Kenneth prodding into what the money was being used for, long story short, right?
>
> A. Long story short was that dad allowed me to use his money, and I did so.
>
> Q. And the fact is that, once you got the power of attorney over your father, over the next two years, you would and you did repeatedly use your father's bank cards and credit cards for your own personal benefit. That is, in fact true, is it not, Mr. McKinley?
>
> A. It wasn't that often that I used his cards for by benefit. And, when I did, it was with dad's permission.

Kevin was then questioned about various purchases that he admitted were not for his father's benefit, such as numerous vacations and trips, payment of his union dues, hobby supplies, emergency rations, cash withdrawals, and Amazon.com purchases. However, Kevin could not remember what they were for. Kevin testified that he kept notes on his computer of what the money was spent on, but he failed to provide those notes in discovery.

5

Kevin then testified regarding the trust established by his father. Kevin said his father named him the successor trustee, and that the same attorney who prepared the power of attorney did the paperwork. However, that attorney refused to make any more amendments to the trust as requested by Kevin, but his current attorneys did so in November 2012. Those amendments include the addition of Paragraph 4.9 which stated:

> "Additional expenses: Any costs or expenses incurred by the trustee, either during the life of the settlor or following his death, that are the result of actions and/or disputes by either principal beneficiary and/or in addition to normal expenses incurred in the administration of the trust shall be assessed against the principal beneficiary causing said expenses and shall reduce the share said beneficiary would have received under the terms of Paragraph 4.1 above."

> "I further direct that the trustee shall be the sole determiner as to whether or not a principal beneficiary has caused additional cost and expenses and the amount thereof."

Kevin admitted that this provision was his idea, and when asked if he could see how this was self-serving he said that, "While it was originally my idea and I proposed it to dad, dad was onboard with it." He further admitted that the trust was modified so that loans given to him during his lifetime by his father would not have to be reimbursed. However, the same courtesy was not extended to Kenneth, and Kevin had his attorneys specifically note that a $14,628.65 loan made to Kenneth was not excused. Kevin admitted to some of the loans made over the years as noted by the inclusion of the word "loan" on the check. He was then questioned about his father's suspicious signature on some checks. He also continued to receive his $4,000 allowance even after this father died claiming:

> Q. . . . You claim that the monies you were paid afterwards on some months but not others was just the bank arbitrarily effectuating an automatic draw into your account for some months, and then they would stop, and they would do it again a few months later? That's your testimony here today?

6

A.    Yes.

Q.    It's your testimony that this was all the bank and had nothing to do with you? This wasn't you going to the bank, pulling out money, sometimes, when you needed it?

A.    It was not.

Kevin was then questioned about the settlement agreement in which he agreed to do certain things in order to sell his father's house such as vacate it and remove his personal property. Kevin admitted that he had not done so because he wants to the buy house. He further had the locks changed so that his brother could not enter the house. But, he had not taken any steps to buy the house such as submitting a proposal with a fair market value purchase price.

On direct examination, Kevin testified that he had been a merchant marine officer working on ships out of the country; however, he was unemployed when he came to Louisiana in September 2011. He temporarily worked at Hobbytown part-time but has been unemployed since his father passed away in January of 2014. Kevin testified that he had his father's permission to make all of the purchases for travel and items on Amazon.com. He described buying certain things for his father on Amazon and said that he had his father's permission to buy hobby and craft supplies, but that it was not a common practice. He said his father allowed him to pay his union dues and order a gun safe.

Regarding the Browning "Sweet Sixteen" shotgun, Kenneth said that his father told him one day that his grandfather wanted him to have it and that his father wanted to make sure he knew about it. Kevin said that he asked his father to hang on to it for him. Kevin further stated that his father never asked him to make any house repairs, and the house was older and in need of repair when he got there.

Regarding some of the loans he received from his father, the following exchange occurred:

7

Q.    . . . All these loans that you described throughout your testimony today, what were the terms of the loans?

A.    The terms weren't specifically mentioned, but, at the time that I made them, it was my understanding that I was going to have to pay that back when the – when the trust was settled.

Q.    You understood that you were going to have to pay it back when the trust was settled. Why did you understand that?

A.    Well, to me, that's what "loan" means.

Q.    Okay. So, then, when the trust was amended to provide that you didn't have to pay back loans, that was a big advantage to you wasn't it?

A.    I guess it was.

Q.    Because you never intended, during your father's lifetime, to make any payments back to him, did you?

A.    Yes, I did.

    . . .

Q.    You never intended, while your father was alive, to make any loan payments to him for money he had loaned you, did you?

A.    Not while he was alive, no. It was my understanding that that would come out of my share of the trust.

Kenneth McKinley testified that he currently lives in Arizona and is a captain in the United States Navy. Kenneth discussed the power of attorney his father gave him in September 2011, in order to pay his bills. Kenneth said that he was very transparent and gave Kevin the passwords and account numbers so that he could see the bills were being paid. Kenneth was the trustee of the trust and executor of his father's will. Kenneth described in detail how his dad, a retired CPA for Amoco Oil, kept meticulous records of money that he had loaned or given to himself or Kevin and how he was extremely fair and "wanted to make sure that each of us got equal amounts." For example, Joe loaned Kenneth $30,000 for a

8

down payment on a house but had advanced Kevin $105,000; thus, Joe specified in the trust that when the account was distributed upon his death, Kenneth was to receive an additional $70,000.

Kenneth then discussed the change in power of attorney in January 2012. He testified that he had no conversations with his father or brother about the change. He said:

> A. Once the power of attorney had been changed, there was no further communication from Kevin, whatsoever. And I immediately flew down to Lafayette. First of all, I call Jim Leonard [the attorney who refused to further amend the POA]. I said: I got this letter in the mail. And he says: You'd better get down here now and address it. So I did.

Kenneth said that Leonard recommended that he take further actions. Kenneth said that Kevin has never spoken to him since he had the power of attorney changed to himself.

Kenneth went on to describe how Kevin had refused to move forward with the sale of the house as he agreed to in the settlement agreement, and had not cooperated with the distribution of the personal property remaining in the house as agreed to in the settlement, including two guns that Kevin had only produced the day before trial. Kenneth testified that everything had been decided in the settlement agreement executed over a year-and-a-half prior to trial, with only the reimbursement claims to remain, but that Kevin had not been cooperative in effectuating the settlement agreement. Kenneth described the deplorable state of his father's house and large quantities of weapons and ammunition, model airplanes, helicopters, remote control devices, and a large gun safe that arrived once Kevin moved in. Kenneth said that his father specifically requested that certain work be done to his house once he entered the assisted living facility, including the replacement of vinyl siding and gutters, and that his father had

9

researched the companies and selected ones for the work but that Kevin never had any of the work done.

Kenneth then reviewed the numerous credit card statements admitted into evidence and described how he excluded any amounts that could conceivably be construed as benefiting his father, such as all grocery and drugstore bills, gas bills, and cash to pay for his father's sitters. Kenneth said that Kevin made large ATM withdrawals on a regular basis that his father would never have approved of because "Dad cherished a penny." Kenneth then testified regarding each of the accounts and the unexplainable amounts including two checks totaling $19,000 made payable to Kevin, one of which stated "loan" on the check (a $12,000 check); an NRA Visa with multiple charges related to travel; a Chase credit card with multiple Amazon.com purchases, late fees, and interest; and travel expenses and other accounts which Kenneth and his attorney went over in detail as to the items for which he was requesting reimbursement.

Kenneth testified about the $6,346.84 payment to Cornerstone. Kenneth believed that Kevin left the goods in the apartment and incurred the additional cost that the estate would not have had to pay had he timely removed them.

Durio, Kevin's former attorney, testified regarding his conversations with Kenneth's counsel about removing Joe's belonging from Cornerstone. Durio had informed Kenneth's counsel that Kevin wished to remove the belongings and place them in storage, even though Kenneth had offered to hire a mover to do so. Durio testified that several months later he received a call from Cornerstone advising that Kevin had not removed the items from Joe's room, and that they had not received payment for the room for the prior two months. Durio said that Kevin claimed that he did not remove the items because he did not have the funds to pay the mover. The attorneys immediately consented to an order allowing Kevin to withdraw the

funds so that the move could be accomplished. Durio testified that had Kevin requested the funds in January, the move would have been effectuated much sooner. Durio further testified that Kenneth's counsel never intentionally lied or misrepresented the truth as to delay the proceedings. Durio was questioned:

> Q.    . . . Do you believe that your attorney's fees and/or the amount of attorney's fees that accrued were the result of any intentional misrepresentations, lies, or inappropriate delay tactics engaged in buy our firm on behalf of Kenneth McKinley?
>
> A.    Absolutely not.

Michael Todd Cope, a real estate appraiser, testified that he was hired to appraise Joe's home. He described it as being in a general state of disrepair. He said that the numerous problems to be repaired would have existed before Joe's passing in January 2014. Cope gave detailed descriptions of the entire house. He conducted a market valuation and came up with a value of $155,000 for the house; however, he did not feel it would sell for that amount once a foundation inspection, HVAC inspection, and a home inspection were conducted. Cope opined that if a contractor were to buy the property, rehab it, and flip it, the selling price would be in the neighborhood of $130,000 to $140,000 at best.

### Manifest Error Standard of Review

> An appellate court, in reviewing a [factfinder's] factual conclusions, must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court's conclusion, and the finding must be clearly wrong. *Kaiser v. Hardin*, 06–2092, pp. 11–12 (La.4/11/07), 953 So.2d 802, 810; *Guillory v. Insurance Co. of North America*, 96–1084, p. 5 (La.4/8/97), 692 So.2d 1029, 1032.
>
> This test requires a reviewing court to do more than simply review the record for some evidence, which supports or controverts the trial court's finding. The court must review the entire record to determine whether the trial court's finding was clearly wrong or manifestly erroneous. *Guillory*, 09–0075 at p. 16, 16 So.3d at 1118: *Kaiser*, 06–2092 at p. 12, 953 So.2d at 810. The issue to be resolved on review is not whether the [factfinder] was right or wrong, but whether the [factfinder's][ ][ ] conclusion was a reasonable one. *Rosell v. ESCO*,

11

549 So.2d 840, 844 (La.1989); *Canter v. Koehring Co.,* 283 So.2d 716, 724 (La.1973).

*McGlothlin v. Christus St. Patrick Hosp.,* 10–2775, pp. 16–17 (La.7/1/11), 65 So.3d 1218, 1231.

### *Fiduciary Duty-Reimbursement*

Generally, whether a fiduciary duty exists, and the extent of that duty, depends upon the facts and circumstances of the case and the relationship of the parties. As a basic proposition, for a fiduciary duty to exist, there must be a fiduciary relationship between the parties...

A fiduciary relationship has been described as "one that exists 'when confidence is reposed on one side and there is resulting superiority and influence on the other.'" *Plaquemines Parish Commission Council v. Delta Development Company, Inc.,* 502 So.2d 1034, 1040 (La.1987), *quoting Toombs v. Daniels,* 361 N.W.2d 801, 809 (Minn.1985).

> The word "fiduciary," as a noun, means one who holds a thing in trust for another, a trustee; a person holding the character of a trustee, or a character analogous to that of a trustee, with respect to the trust and confidence involved in it and the scrupulous good faith and candor which it requires; a person having the duty, created by his undertaking, to act primarily for another's benefit in matters connected with such undertaking.

*State v. Hagerty,* 251 La. 477, 492, 205 So.2d 369, 374 (1967), *quoting* 36A C.J.S. Fiduciary, p. 381. One is said to act in a fiduciary capacity "when the business which he transacts, or the money or property which he handles, is not his own or for his own benefit, but for the benefit of another person, as to whom he stands in a relation implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other." *Hagerty,* 251 La. at 493, 205 So.2d at 374-375, *quoting* BLACK'S LAW DICTIONARY (4th ed.1951).

The term "fiduciary" is defined in the Uniform Fiduciaries Law, LSA-R.S. 9:3801(2), as follows:

> "Fiduciary" includes a trustee under any trust, expressed, implied, resulting or constructive, executor, administrator, guardian, conservator, curator, receiver, trustee in bankruptcy, assignee for the benefit of creditors, partner, agent, officer of a corporation, public or private, public officer, or any other persons acting in a fiduciary capacity for any person, trust or estate.

12

The Uniform Fiduciaries Law appears in the Civil Law Ancillaries under Code Title XV-Of Mandate. By definition, a mandate is "a contract by which a person, the principal, confers authority on another person, the mandatary, to transact one or more affairs for the principal." LSA-C.C. art. 2989. The defining characteristic of a fiduciary relationship, therefore, is the special relationship of confidence or trust imposed by one in another who undertakes to act primarily for the benefit of the principal in a particular endeavor. *Plaquemines Parish Commission Council,* 502 So.2d at 1040; *Hagerty,* 251 La. at 493, 205 So.2d at 374-375

*Scheffler v. Adams and Reese LLP,* 06-1774, p. 6-7 (La. 2/22/07), 950 So.2d 641, 647-648. Further, "The mandatary is bound to fulfill with prudence and diligence the mandate he has accepted. He is responsible to the principal for the loss that the principal sustains as a result of the mandatary's failure to perform." La.Civ.Code art. 3001. In order to prove breach of a fiduciary duty, the claimant must show that the party acted fraudulently, breached the trust bestowed upon him, or took actions that exceeded those granted to him. *Sampson v. DCI of Alexandria,* 07-671 (La.App. 3 Cir. 10/31/07), 970 So.2d 55.

The trial court stated:

> He had a duty, as a fiduciary, not to self-deal. He has done nothing to document that any of this was other than self-dealing. All his response is, is, my dad told me I could do it.
>
> Now, I agree on things when his father signed the check. But there's been no testimony or evidence that his father, in any way, signed off on checks to pay these credit card bills or even saw the credit card bills.
>
> And there's a lot of stuff charged on this that cannot, in any way, be imputed to benefit the decedent in this case – Mr.; McKinley, at the time he was alive.
>
> . . . .; [H]e was clearly self-dealing by spending the money on himself for his personal expenses.

We find no error in trial court's finding that Kevin breached his fiduciary duty to his father by self-dealing. The trial court did not find Kevin's overall testimony credible nor his claim that his father authorized him to make purchases

13

and use his credit cards to travel. Kevin argues that the "Power of Attorney, Trust, and other documents show the intention and understanding of the Decedent in direct contrast to the allegations of the Appellee." We disagree. A power of attorney does not authorize the grantee the right to self-deal. The nature of Joe's past dealings with his sons, his desire to keep things "even," and his overall frugal and precise nature as a CPA indicate that he would not have allowed Kevin to make all of these purchases and travel at his expense, particularly without an accounting. Kevin readily admitted that save for some Old Spice deodorant, some candies, and a toilet ring, all of the numerous Amazon.com purchases along with purchases of guns and hobby supplies were for his personal benefit. Further, Kevin admitted that he did quite a bit of traveling on his father's dime, even though he had no personal expenses except for his $950 mortgage in Virginia. He received a $3,000 to $4,000 a month allowance from his father.

Kevin further argues that the trial court erred in ordering him to reimburse the estate for the $19,000 in checks drawn on the Whitney account because the trial court stated it was "not going to order any repayment of any checks to Mr. Kevin McKinley that were signed by his father." Kevin also argues that the third amendment to the trust clearly specifies that any loans made during Joe's lifetime were forgiven. Clearly, the trial court was referring to numerous other subsequently written checks besides the two in question, which Kevin himself admitted in testimony above were loans which he expected to be repaid from estate funds at settlement. It was reasonable for the trial court to conclude that the two checks totaling $19,000 were loans which would have to be repaid.

Additionally, Kevin's self-serving amendment to the trust agreement is immaterial for a number of reasons, the least of which is his breach of his fiduciary duty to his father. Once the parties entered into the settlement agreement of July

14

2014, which "related to the succession of their father, Joe Andy McKinley . . . and/or The McKinley Living Trust of 2005," the trust document and its self-serving amendments created by Kevin became moot. The parties agreed in the settlement agreement:

> 6. Each Party reserves the right to negotiate with the other and/or seek a Court determination of any reimbursements that said Party feels are due the Estate of Joe Andy McKinley and/or the McKinley Living Trust of 2005 and arising out of the activities of the said Party prior to or after the death of Joe Andy McKinley and the ultimate conclusion of those claims, whether by settlement or litigation will be satisfied out of the remaining balance of Merrill Lynch Account No. XXX-XXXXX.

Accordingly, Kevin's claim that the trust authorized the excusal of any checks written to him was a reimbursement claim to be determined without reference to the trust amendments. This assignment of error is without merit.

### Reimbursement of Assorted Costs

Kevin, again relying on the trust agreement paragraph 4.9, argues that all attorney fees that he is responsible for paying should be paid out of the trust because it was in his sole discretion to determine who was the cause of the delay in the litigation. Although the trial court did not address whether this provision of the trust was applicable, for the reasons noted above, we find that the settlement agreement essentially did away with the provisions of the trust document. Moreover, from a factual standpoint, even if the provision were valid, the trial court clearly found that Kevin was the sole cause of the delay and the extensive litigation costs that ensued were his personal responsibility and would not be imputed to the estate. We find no error in that finding and this assignment is without merit.

15

### *Browning "Sweet Sixteen" Shotgun*

Kevin argues that a manual donation of the Browning "Sweet Sixteen" shotgun was confected, and he was the rightful owner of the gun. Louisiana Civil Code Articles 1543 requires that in order for a valid donation of a corporeal movable to be completed, there must be delivery of thing to the donee without any other formality. A person may acquire possession of a thing through another who takes it for him and in his name. La.Civ.Code art. 3428. There was some dispute about who originally even owned the gun (the maternal or paternal grandfather). The trial court clearly did not believe Kevin's story that his father took him into the room and told him that his grandfather wanted him to have the gun and that Kevin asked his father to hold it for him. Again, Kevin's credibility was seriously called into question throughout this trial, and it was reasonable for the trial court to conclude that a valid donation of the gun did not take place. There is no manifest error in trial court's finding that a valid manual donation had not been made to Kevin and, therefore, Kenneth rightfully won ownership of the gun through the sealed bidding method instituted by the trial court. Accordingly, this assignment of error is without merit.

### *Reduction of Kenneth's Share in Judgment*

Kevin argues that the trial court erred in failing to reduce Kenneth's inheritance by $14,628.65 in the final judgment. This is a moot issue, as Kenneth admitted in brief this was an oversight and that his share is to be reduced by the $14,628.65. Accordingly, we order that the trial court amend the judgment to include the reduction of Kenneth's share.

16

*Cornerstone Delay*

The trial court found:

> Insofar as the Cornerstone bill is concerned, there was a lot of back and forth about it, but one thing is clear – that, as between the attorneys, there was a clear understanding, shortly after Mr. McKinley's death, that Kevin wanted to be the one to move the items out, and that he was going to undertake to do so.
>
> And, apparently, there was substantial delay before it came to light that the items had not been removed, and that he gave the excuse of being, he didn't have permission to do. It's also clear – and he even admitted it – that, during that time, he was using the room, for some reason.

We find no error in the trial court's finding that Kevin was the cause of the delay and, therefore, must reimburse the estate $3,173.42, which is half of the $6,346.84 bill. Kenneth initially offered to handle the removal of Joe's items from Cornerstone and move them to a storage facility, but Kevin insisted that he would do it. Kevin then visited Cornerstone on a daily basis to use the internet and for other unknown reasons. His excuse that he did not have permission to remove the items because of the initial restraining order that was granted to Kenneth is simply not credible when there was a clear understanding that Joe's remaining personal property was to be removed from the assisted living facility as soon as possible to minimize costs. Accordingly, this assignment of error is without merit.

## CONCLUSION

The trial court's findings were reasonable in light of the evidence and, therefore, cannot be manifestly erroneous. Accordingly, the judgment of the trial court is affirmed. The trial court is instructed to amend the final judgment to include the reduction of $14,628.65 from Kenneth's share. All costs of this appeal are assessed against the appellant, Kevin McKinley.

**AFFIRMED WITH INSTRUCTIONS.**